WILLIAM B. O'ROURKE AND NANCY N. O'ROURKE, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
O'Rourke v. Commissioner
Docket No. 26488-87
United States Tax Court
T.C. Memo 1990-161; 1990 Tax Ct. Memo LEXIS 143; 59 T.C.M. (CCH) 228; T.C.M. (RIA) 90161; March 26, 1990
Leonard J. Seraphin, for the petitioners. Elaine Geer, for the respondent. RUWE
*388 MEMORANDUM FINDINGS OF FACT AND OPINION RUWE, Judge: Respondent determined deficiencies in petitioners' Federal income taxes and additions to tax as follows: Additions to Tax
Year
Deficiency
Sec. 6651(a)(1) [1]
Sec. 6653(a)(1)
Sec. 6653(a)(2)
1981
$ 11,633
$  3,175
--
--
1982
94,091
23,676
$ 4,741
50 percent of  the interest   due on $ 50,367
Following concessions, [2] the issues for decision are: (1) Whether amounts paid by petitioners in 1981 and 1982 as interest on indebtedness *146 are deductible in full under sections 162 and 163(a), or whether such amounts constitute "investment interest" within the meaning of section 163(d) and are, accordingly, subject to the limitations on deduction set out in that subsection; *389 (2) whether amounts paid to William B. O'Rourke (Mr. O'Rourke) by Elgin National Bank (ENB) during 1982 were received as compensation or as payment for ENB stock; [3] (3) whether amounts paid to Mr. O'Rourke by ENB during 1981 and 1982 constitute compensation, or a combination of compensation and constructive dividends; (4) whether petitioners are liable for the additions to tax under sections 6651(a)(1), 6653(a)(1), and 6653(a)(2); and (5) whether petitioners should be permitted to amend their petition. Adjustments to petitioners' medical expense deductions and sales tax deductions for 1981 and 1982 are automatic and will be calculated as part of the Rule 155 computation. *147 FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of settled issues and the stipulation of facts and attached exhibits are incorporated herein by this reference. Petitioners resided in Elgin, Illinois when they filed their petition in this case. At the beginning of 1979, Mr. O'Rourke, together with Harold J. Ticktin, Paul D. Olson, and William F. Powers, purchased a controlling number of shares of ENB stock. By 1981, Mr. O'Rourke and his associates owned 80 percent of the ENB stock. Mr. O'Rourke owned 30,048 shares or approximately 20 percent of the total shares. The ENB stock purchase was partially financed with a $ 3,050,000 loan from American National Bank and Trust Company of Chicago (ANB) on which Mr. O'Rourke and his three associates were jointly and severally liable. The interest rate on this loan was set at a rate equal to one-half percent above the prime rate. Mr. O'Rourke had no personal funds with which to buy the bank stock and his entire acquisition was financed through borrowing. In early 1979, the Comptroller of the Currency considered ENB to be a problem bank. The previous president of the bank had been forced to *148 resign and the bank suffered from low liquidity, numerous problem loans, and a poor reputation in the community. Mr. O'Rourke was aware of ENB's problems prior to his purchase of ENB stock. Mr. O'Rourke was of the opinion that the purchase price which he and his associates paid in 1979 reflected the fair market value of the ENB stock. Mr. O'Rourke believed that under his management ENB would become profitable. Mr. O'Rourke also believed that as bank profits increased, his personal investment in ENB stock would be profitable. On February 6, 1979, after Mr. O'Rourke and his associates purchased control of ENB, he was elected president and chief executive officer of ENB. As president and chief executive officer, Mr. O'Rourke was required to own 320 shares of ENB stock. Two years after Mr. O'Rourke became president, ENB was no longer considered a problem bank by the Comptroller of the Currency. Deposits and profits had increased sharply, the bank was paying dividends, and the value of ENB stock had increased. During 1981 and 1982, ENB held deposits of between $ 50 and $ 55 million dollars. In October 1981, Mr. O'Rourke and the three business associates who had joined him in the *149 ENB stock purchase, disagreed over a proposal to purchase a second bank. Mr. O'Rourke's business associates wanted to borrow additional funds to purchase a second bank and consolidate the new loan with the outstanding ANB loan that had been used to finance their purchase of ENB. Mr. O'Rourke did not want to assume any additional loan obligations. Mr. O'Rourke was warned that if he refused, he would be fired by ENB's board of directors. On November 4, 1981, Mr. O'Rourke was informed by telegram that the board of directors had voted to relieve him of his duties as president and chief executive officer of ENB. On November 11, 1981, Mr. O'Rourke, along with six other directors and shareholders of ENB, filed a civil suit charging the seven members of the board of directors who had voted to relieve Mr. O'Rourke of his duties with violating the bank's bylaws. On January 18, 1982, Mr. O'Rourke entered into an agreement with Harold J. Ticktin, Paul D. Olson, William F. Powers, ENB, and ANB. Under the terms of the agreement, Mr. O'Rourke sold all of his shares in ENB. The agreement provides for various transfers of money between the parties to the agreement, but does not explicitly *150 state the nature or purpose of each transfer. The agreement also purports to resolve a number of issues concerning Mr. O'Rourke's relationship with ENB, including Mr. O'Rourke's resignation as president and chief executive officer of the bank. In pertinent part, the agreement provides as follows:
3. Concurrently with the execution of this agreement, O'Rourke will deliver to Olson letters of resignation * * * signed by O'Rourke. 4. Concurrently with the execution of this agreement ENB will deliver to O'Rourke ENB's checks in the amount of $ 50,000, *390 $ 25,000 and $ 20,000, each of them payable to O'Rourke. * * * 7. ENB agrees that O'Rourke may retain, without payment by him, the 1982 Buick Electra which he obtained during his course of employment as president of ENB. Concurrently with the execution of this agreement, ENB will deliver to O'Rourke the title to the 1982 Buick Electra, assigned by ENB to O'Rourke. 8. ENB agrees to pay severance pay to O'Rourke at the rate of $ 2,000 per month, payable on the last business day of each month in 1982. Olson agrees that if for any reason ENB does not pay any installment of severance pay when due, he will personally *151 pay that installment within ten days after payment was due. 9. Concurrently with the execution of this agreement, ENB will deliver to O'Rourke a certified resolution of ENB's board of directors authorizing it to make the payments specified in paragraph 4 and to enter into the agreements specified in paragraphs 7 and 8. 10. Concurrently with the execution of this agreement, Olson will deliver to O'Rourke a press release * * * signed by Olson. Upon the delivery of this press release to O'Rourke, O'Rourke is authorized to make the press release available to the media. Neither O'Rourke nor Olson will make any further comment to the media about the circumstances surrounding O'Rourke's resignation; O'Rourke's employment by ENB; or the controversy between O'Rourke and Olson and ENB; nor will any other officer of ENB be authorized to make any comment to the media on any of those subjects. * * * 14. O'Rourke releases ENB from any claims he has against it, except that he does not release ENB from its continuing obligations to him under this agreement. * * * 17. ENB releases O'Rourke from any claims it has against him.
Under the terms of the agreement, Mr. O'Rourke *152 and his former business associates (Messrs. Olsen, Powers, and Ticktin) also released each other from all claims except for any continuing obligations set forth in the agreement. Although not specifically set forth in the agreement, it is apparent that Mr. O'Rourke agreed to dismiss his law suit. Mr. O'Rourke paid interest expenses in the amounts of $ 104,337.88 in 1981 and $ 78,668.72 in 1982 on loans used to acquire and hold his stock in ENB. These interest payments were reported on petitioners' 1981 and 1982 income tax returns as employee business expenses. [4] The profit on the sale of Mr. O'Rourke's ENB stock in 1982, was reported on petitioners' 1982 income tax return as a capital gain. Petitioners' tax returns for 1980, 1982, and 1983, reported no taxable income and their 1981 tax return reported taxable income of $ 17,447. On their 1980 income tax return, petitioners reported that *153 Mr. O'Rourke had wages, dividends, and director's fees from ENB in the respective amounts of $ 115,000, $ 19,881, and $ 14,000. During 1981, Mr. O'Rourke received $ 113,667 in wages and $ 45,288 in dividends from ENB. Mr. O'Rourke also reported receiving director's fees of $ 3,000 from ENB during 1981. During 1982, Mr. O'Rourke received $ 119,000 and an automobile with a fair market value of $ 12,050 from ENB. The $ 119,000 received during 1982 included three cashier's checks in the amounts of $ 20,000, $ 25,000, and $ 50,000. The remaining $ 24,000 was paid to Mr. O'Rourke in twelve checks, each in the amount of $ 2,000, as severance pay. Petitioners concede that the $ 24,000 in severance pay was compensation for services. The three cashier's checks in the amounts of $ 20,000, $ 25,000, and $ 50,000 were prepared by Judy Lee Schorler, comptroller and assistant vice president of ENB. Although the three cashier's checks are dated December 31, 1981, the parties agree that Mr. O'Rourke received the funds in 1982. These checks were drawn on the ENB salaries account pursuant to the instructions of the president of ENB and its accountant. It was ENB's practice to use the salaries *154 account to pay regular salaries, bonuses, and severance pay. It was not irregular for ENB to issue a cashier's check for payroll purposes. During early 1982, Mr. O'Rourke received three separate Forms W-2 from ENB for tax year 1981. The first W-2 which he received reported that he had been paid 1981 wages of $ 100,124.98. The second W-2 reported wages of $ 231,784.96 and the third W-2 reported wages of $ 245,326.54. Mr. O'Rourke believed that the first W-2 was correct, but called the bank after receiving the second form. Mr. O'Rourke spoke with Bernice Koehring, a bank employee, who provided Mr. O'Rourke with a recap of the compensation reported on the second W-2 for 1981. The recap erroneously included the car and other amounts that had been paid to Mr. O'Rourke during 1982 rather than 1981. Mr. *391 O'Rourke did not receive a Form W-2 or Form 1099 from ENB for tax year 1982. On September 14, 1982, petitioners were notified that their Federal income tax return for 1980 had been selected for examination by the Internal Revenue Service (IRS). According to the notification letter, the IRS sought to examine all records relating to rental income and expenses, business *155 interest, and other business expenses claimed on the return. On March 22, 1983, petitioners were informed by letter that no change was required in the amount of tax reported on their 1980 tax return. The letter also indicated that petitioners' 1980 tax return was accepted as filed. Petitioners obtained an extension of time to file their 1981 return until June 15, 1982. Petitioners did not obtain an extension of time within which to file their 1982 return. Petitioners' 1981 Federal income tax return was filed on January 27, 1983. Petitioners' 1982 Federal income tax return was filed on August 30, 1984. OPINION Applicability of Section 163(d)
The first issue for decision is whether the interest expenses deducted by petitioners during 1981 and 1982 are limited under section 163(d). Petitioners argue that the interest paid in 1981 and 1982, for the purpose of acquiring and holding ENB stock, constitutes an ordinary and necessary business expense deductible under sections 162 and 163(a). Mr. O'Rourke contends that he purchased the ENB stock to obtain the position of president and chief executive officer of ENB, and that investment considerations had little or no influence *156 on his decision to buy the stock. Respondent disagrees and contends that the stock constitutes "property held for investment" within the meaning of section 163(d)(3)(D), so that the interest paid during 1981 and 1982 falls within the definition of "investment interest" and is not fully deductible. Investment interest is defined as "interest paid or accrued on indebtedness incurred or continued to purchase or carry property held for investment." Sec. 163(d)(3)(D). The term "property held for investment" is not defined in section 163(d) or the regulations thereunder. Recklitis v. Commissioner, 91 T.C. 874, 907 (1988); Polakis v. Commissioner, 91 T.C. 660, 667 (1988). The legislative history, however, indicates that for purposes of section 163(d), "investment property" is property other than personal use property or trade or business property. Recklitis v. Commissioner, supra at 907; Polakis v. Commissioner, supra at 667. Whether property was held for investment depends on whether the acquisition or retention of the property was motivated by a "substantial investment intent." Miller v. Commissioner, 70 T.C. 448, 455 (1978). *157 [5] Under this test, the extent to which investment rather than business considerations motivate a purchase is essentially a factual question. Recklitis v. Commissioner, supra at 907; Polakis v. Commissioner, supra at 667; Miller v. Commissioner, supra at 456. In Polakis v. Commissioner, supra at 666, the issue was whether interest incurred in the purchase of a piece of real property constituted investment interest within the meaning of section 163(d). We found that the taxpayers acquired and held the property for purposes of investment. We specifically declined, however, to accept respondent's contention that all capital assets *158 are always held for investment. Polakis v. Commissioner, supra at 672. Instead, we found that the Supreme Court's opinion in Arkansas Best Corp. v. Commissioner , 485 U.S. 212 (1988), did not preclude the possibility that a capital asset could be acquired for a business as contrasted with an investment purpose. Polakis v. Commissioner, supra at 672; Recklitis v. Commissioner, supra at 907. In Recklitis v. Commissioner, supra at 874, the issue was whether interest paid on a $ 2,450,000 bank loan to raise cash for use in the taxpayer's closely held corporation was subject to limitation under section 163(d). We recognized that "in some circumstances, stock may be acquired for business purposes without substantial investment purposes." Recklitis v. Commissioner, supra at 907. After examining the facts to ascertain the presence or lack of substantial investment intent, we found that the taxpayer held the stock as an investment and therefore applied the limits of section 163(d). Recklitis v. Commissioner, supra at 907-908. We believe that *159 the facts in this case indicate that Mr. O'Rourke's acquisition and retention of ENB stock was motivated by substantial investment purposes. We have recognized that stock by its nature is normally acquired and owned for investment purposes. Recklitis v. Commissioner , supra at 907; Miller v. Commissioner, supra at 455; W. W. Windle Co. v. Commissioner, 65 T.C. 694, 714 n.15 (1976); see Arkansas Best Corp. v. Commissioner, supra at *392 222-223. The only evidence that Mr. O'Rourke's motive for acquiring and holding his ENB stock was for a non-investment purpose was his own testimony. That testimony does not convince us that this case is an exception to the norm. Mr. O'Rourke testified about his thoughts in early 1979 concerning the possibility of acquiring a controlling interest in ENB. Specifically, he testified that he believed "That it indeed might be possible to purchase that bank and pursue a lifelong dream of being President of that bank. I had worked at that bank several years prior to that. I'd started my banking career there." This testimony is not inconsistent with a finding that *160 Mr. O'Rourke's purchase and retention of ENB stock was motivated by substantial investment purposes. The objective of obtaining gainful employment can constitute a business purpose. However, the existence of such a business purpose is not inconsistent with also having a substantial investment motive. Recklitis v. Commissioner, supra at 908; Miller v. Commissioner, supra at 457. Mr. O'Rourke's testimony is clearly insufficient to carry petitioners' burden of proof that Mr. O'Rourke did not have a substantial investment motive. There are affirmative indications in the record to support a finding that Mr. O'Rourke's purchase of ENB stock was prompted by a substantial investment motive. At the time of the stock purchase, Mr. O'Rourke was well aware of ENB's poor financial situation. In early 1979, the Comptroller of the Currency considered ENB to be a problem bank. The previous president of ENB had been forced to resign and the bank suffered from low liquidity, numerous problem loans, and a poor reputation in the community. The previous stockholders had lost their stock to a creditor. After taking these problems into consideration, Mr. *161 O'Rourke believed that the purchase price which he and his associates paid for the ENB stock was reasonable. Mr. O'Rourke believed that he had the knowledge and ability to turn ENB into a successful operation and make it profitable. Over the next three years ENB did become a profitable and successful bank. The value of the stock increased significantly between 1979 and 1982. We believe that Mr. O'Rourke purchased the stock in 1979, with the expectation that the bank would become profitable under his management and that the bank stock would increase in value. The expectation of earning a profit through the appreciation and eventual sale of stock is indicative of an investment motive. Miller v. Commissioner, supra at 457. We also make the observation that Mr. O'Rourke's testimony regarding what he believed to be a reasonable salary for his services as president and chief executive officer of ENB does not support his argument that he purchased the ENB stock solely for purposes of attaining those positions. He testified that a reasonable salary for his executive positions at ENB during the years in issue was somewhere between $ 40,000 and $ 60,000 per year. *162 As explained later, we do not accept Mr. O'Rourke's argument that the portion of his salary in excess of $ 60,000 was unreasonable. Nevertheless, if $ 40,000 to $ 60,000 was truly what he believed to be a reasonable salary when he purchased the ENB stock, it is inconceivable that he would have paid approximately $ 750,000 for his ENB stock, [6] incurred over three million dollars in personal liability, [7] and become obligated to pay annual interest on his share of the debt in amounts that exceeded what he thought was a reasonable salary, unless he also had a substantial investment motive. A large disparity between investment costs and salary income indicates the importance of the investment motive. Recklitis v. Commissioner, supra at 908; Miller v. Commissioner, supra at 458. *163 Whether $ 95,000 and an Automobile Received from ENB in 1982 was Compensation
Petitioners argue that the three cashier's checks, totalling $ 95,000, and the automobile received from ENB during 1982 were received as part of the proceeds from the sale of Mr. O'Rourke's ENB stock [8] and not as compensation. We disagree. Petitioners failed to produce testimony of any of the other parties to the January 18, 1982 agreement wherein Mr. O'Rourke sold his ENB stock and released ENB and the other parties from whatever liability they may have had to him. We find no convincing evidence to support petitioners' argument that ENB was paying Mr. O'Rourke for his stock when it issued the three checks and gave him the automobile. While there are some ambiguities regarding the agreement, whereby Mr. O'Rourke sold his stock and settled his claims *164 against ENB, a number of factors tend to indicate that the three *393 cashier's checks and the car were paid to Mr. O'Rourke as compensation. For example, the three cashier's checks paid to Mr. O'Rourke in 1982 were drawn on ENB's salaries account. The ENB employee who prepared these checks was instructed to draw them on the salaries account by ENB's president and accountant. Checks drawn on the salaries account were used to pay regular salaries, bonuses, and severance pay. It was not irregular for ENB to issue a cashier's check for payroll purposes. As part of the January 18, 1982 agreement, Mr. O'Rourke released ENB from any claims other than those continuing obligations discussed in the agreement. The only apparent claim that Mr. O'Rourke may have had against ENB concerned his discharge as president and chief executive officer of ENB. The payment of $ 95,000 and an automobile is clearly consistent with a release of a claim arising out of his employment relationship with ENB. Payments received for a release of a claim by an employee against an employer constitute ordinary income. Knuckles v. Commissioner, 349 F.2d 610, 613 (10th Cir. 1965), affg. *165 a Memorandum Opinion of this Court; see also Heyn v. Commissioner, 39 T.C. 719, 720 (1963). We can see no apparent reason why ENB would pay Mr. O'Rourke for the sale of his ENB stock. Mr. O'Rourke did not sell the stock to ENB. He sold it to one of his former business associates. [9] We can discern no legitimate reason, therefore, why ENB would pay Mr. O'Rourke for his stock. Based on the record in this case, we will not assume that the ENB payments were improperly made on behalf of other persons and improperly charged to ENB's salary account. We also find it significant that Mr. O'Rourke was admittedly confused about the terms of the stock sale. Mr. O'Rourke argued at trial and on brief that one of the reasons for his failure to timely file his 1982 income tax return was his confusion concerning the terms of the stock sale. This confusion stems, at least in part, from Mr. O'Rourke's failure to carefully delineate the terms of the stock sale in the January 18, 1982 agreement. Petitioners *166 have failed to establish that the three cashier's checks or the automobile was received as partial payment for Mr. O'Rourke's stock. Accordingly, these amounts are includable in petitioners' ordinary income and were properly excluded by respondent in computing the gross sales proceeds received by petitioners from the sale of the ENB stock. [10]
Whether 1981 and 1982 Payments from ENB were Part Compensation and Part Dividend
The deduction for investment interest paid or incurred by a noncorporate taxpayer is limited to the sum of $ 10,000 plus net investment income. Net investment income is the difference between: (a) investment income from interest, dividends, rents from net lease property, royalties, net short term capital gain from investment property and Code sections 1245, 1250, and 1254 gain from investment property, and (b) investment expense. Investment expenses are those deductible expenses directly connected with the production of investment income. Sec. 163(d)(3)(C). *167 The amount of investment interest that is disallowed solely by reason of the limitation formula can be carried over indefinitely. Sec. 163(d)(3)(E). No carryover is permitted, however, for disallowed investment interest to the extent that it exceeded the taxpayer's taxable income for the year in which the interest was paid or accrued. Beyer v. Commissioner, 92 T.C. 1304, 1310-1311 (1989); see also Rev. Rul. 86-70, 1986-1 C.B. 83, 84. Petitioners contend that if we find the investment interest limitations of section 163(d) applicable in this case, then we should also find that the amounts paid to petitioners by ENB in 1981 and 1982 are partially compensation and partially disguised dividends. [11] Petitioners claim that a yearly salary of between $ 40,000 and $ 60,000 was reasonable during 1981 and 1982 for a bank president employed at a bank the size of ENB. Petitioners argue, therefore, that the difference between that amount and the amounts which Mr. O'Rourke actually received from ENB in 1981 and 1982, must be considered to be disguised dividends arising from stock *394 ownership. [12] If petitioners are correct, they would be permitted *168 to deduct an increased amount of investment interest, due to the resulting increase in net investment income. Petitioners bear the burden of proof. Rule 142(a). *169 At trial, petitioners introduced a confidential salary survey for 1983 prepared by the Illinois Bankers Association. The survey categorizes banks in the Chicago metropolitan area according to total deposits and provides compensation ranges for twelve different executive positions at these banks. ENB, with deposits of between $ 50 and $ 55 million dollars during the years in issue, would compare most closely with banks having deposits under $ 100 million. The survey reports a compensation range of $ 15,900 to $ 111,575 for the position of bank chairman and $ 42,500 to $ 98,689 for the position of bank president. In addition to the salary survey, petitioners also introduced the minutes from an ENB board of directors meeting held on November 16, 1981. The minutes indicate that Mr. O'Rourke's replacement at ENB was to receive a monthly salary of $ 4,000. On brief, petitioners argue that in situations where corporate officers set their own compensation, "careful scrutiny is required to determine whether the purported compensation may be a disguised dividend." Petitioners then state that it is "encumbent [sic] upon this Court to decide whether [unreasonable payments made to Mr. *170 O'Rourke] were a distribution of earnings and profits of the Elgin National Bank and as such a contribution of capital to the taxpayer." At trial, the following discussion transpired: Q. [MR. SERAPHIN]: Do you recall what your salary was in 1980, approximately 1980, '81, as President of the bank? A. [MR. O'ROURKE]: It was over $ 100,000. Q. [MR. SERAPHIN]: And how was that salary set? A. [MR. O'ROURKE]: My partners and myself would decide basically what I was worth as President and there was additional sums that was created to pay interest. A short time later, Mr. O'Rourke discussed the procedure through which ENB declared dividends: Q. [MR. SERAPHIN]: Did you also receive dividends from the Elgin National Bank? A. [MR. O'ROURKE]: Yes. Q. [MR. SERAPHIN]: And what was the procedure by which those dividends were determined and declared? A. [MR. O'ROURKE]: That myself and my partners would decide what we though [sic] we could possibly declare in the way of dividends without alienating regulatory authorities.
Q. [MR. SERAPHIN]: There were limitations placed on the amount of dividends? A. [MR. O'ROURKE]: There weren't specific written *171 limitations, but it was pretty much understood that in a bank that had problems like Elgin National had in the past that if you went much over the five percent that there would be some consequence at a later date, so we tried to stay within that as much as we could. Petitioners have failed to present sufficient evidence to allow us to make a determination that any portion of the compensation received from ENB during the years in issue was paid in the form of a disguised dividend. The salary survey reports salaries ranging from $ 15,900 to $ 111,575 for the position of bank chairman and $ 42,500 to $ 98,689 for the position of bank president. On brief, petitioners merely argue that the survey "indicates that the reasonable compensation for an executive of Mr. O'Rourke's stature at a similarly sized bank * * * would be approximately $ 50,000.00 per year." We are not persuaded that the salary paid to Mr. O'Rourke was unreasonable. First, Mr. O'Rourke served ENB as both president and chief executive officer. The salary survey makes no provision for bank officers who hold more than one position. More importantly, profits at ENB increased substantially during Mr. O'Rourke's tenure at *172 the bank. Considering Mr. O'Rourke's successful record at ENB, we are unwilling to find that the salary he received was unreasonable.
Petitioners also find solace in the minutes from the November 16, 1981 ENB board of directors meeting wherein Mr. O'Rourke's successor was voted a yearly salary of $ 48,000. [13] This evidence, however, does not establish that Mr. O'Rourke's salary was unreasonable. At most, it indicates that Mr. O'Rourke's successor did not command as high a salary as did Mr. O'Rourke. Although we have chosen to reject petitioners' argument that the salary paid to Mr. O'Rourke was unreasonable, we find petitioners' willingness to characterize the purported excess payments as disguised dividends somewhat disturbing. If we were to accept petitioners' argument, we would also have to accept the fact that Mr. O'Rourke and his associates knowingly *395 disguised dividends to hide their conduct from the Comptroller of the Currency. Such a finding would *173 certainly reflect poorly on Mr. O'Rourke's credibility as a witness. Petitioners' argument is also disturbing in light of the disparate tax treatment accorded wages and dividends. Amounts paid as wages are fully deductible. There is no deduction available to a corporation, however, for amounts paid as dividends. Mr. O'Rourke was president and chief executive officer of ENB. A finding that ENB, under the direction of Mr. O'Rourke, took a deduction for amounts purportedly paid as wages, but that were actually nondeductible dividends, would similarly reflect poorly on Mr. O'Rourke's credibility as a witness. Additions to Tax
The next issue for decision is whether petitioners are liable for additions to tax under section 6651(a)(1). Section 6651(a)(1) imposes an addition to tax upon a taxpayer who fails to file a timely return, unless the taxpayer shows that his failure to file was due to reasonable cause and not due to willful neglect. Petitioners bear the burden of proof on this issue. Horton v. Commissioner, 86 T.C. 589, 597 (1986); Baldwin v. Commissioner, 84 T.C. 859, 870-871 (1985); Rule 142(a). Petitioners' 1981 income tax return *174 was filed on January 27, 1983, over seven months after its due date. Petitioners' 1982 income tax return was filed on August 30, 1984, over nineteen months after its due date. Petitioners argue that their 1981 tax return was filed late because of the errors contained on the three Forms W-2 received from ENB. On brief, petitioners contend that "after months of trying to get correct answers from his former employer, [Mr. O'Rourke] determined that only a small amount of tax was due on the 1981 return and no tax was due on the 1982 return, and filed the returns with the best information he could obtain." Petitioners argue, therefore, that their inability to obtain information from ENB[14] constitutes reasonable cause for their failure to timely file their income tax returns. We disagree. *175 Petitioners have provided no evidence to support their contention that Mr. O'Rourke made any attempt to obtain additional information from ENB after he received the 1981 salary recap from Bernice Koehring. Although we agree with petitioners that all three Forms W-2 and the salary recap contained errors, this fact, standing alone, is insufficient to establish that petitioners' failure to timely file their 1981 and 1982 tax returns was due to reasonable cause. Unavailability of records, without more, is not reasonable cause for failure to file a timely return. Young v. Commissioner, T.C. Memo. 1989-480; Regan v. Commissioner, T.C. Memo. 1987-512; Hackett v. Commissioner, T.C. Memo. 1970-17. If petitioners were having problems obtaining information as the due dates for filing their tax returns approached, they could have requested additional extensions of time to file their returns. If complete information could not be obtained within the extended time to file, they could have filed on the basis of available information and provided the IRS with an explanation. We also find petitioners' argument that they were relying on ENB's *176 board of directors to tell them which monies were paid as compensation and which were paid for the ENB stock to be without merit. In negotiating the sales agreement, Mr. O'Rourke gave up valuable rights and agreed to sell stock worth over a million dollars. Petitioners are arguing, in essence, that only Mr. O'Rourke's former associates knew the exact terms of the sales agreement. Mr. O'Rourke was a banker and understood financial transactions. We simply cannot believe that he gave his former partners the freedom to choose an allocation scheme. Accordingly, we hold that petitioners are liable for the addition to tax under section 6651(a)(1). Respondent also determined that petitioners are liable for the additions to tax under section 6653(a)(1) and section 6653(a)(2) for negligence or intentional disregard of rules and regulations. In the notice of deficiency, respondent determined that petitioners negligently failed to report as income on their 1982 tax return the receipt of the automobile and that petitioners negligently calculated the amount of capital gain resulting from the sale of ENB stock. Negligence, within the meaning of section 6653(a), has been defined as the failure *177 to do what a reasonable and ordinarily prudent person would do under the circumstances. Neely v. Commissioner, 85 T.C. 9343, 947 (1985). Petitioners bear the burden of proof on this issue. Bixby v. Commissioner, 58 T.C. 757, 791 (1972); Enoch v. Commissioner, 57 T.C. 781, 802-803 (1972). Petitioners have failed to meet this burden. [15]
*178 *396 Motion to Amend Petition
The final issue for decision is whether petitioners are entitled to amend their petition. On April 28, 1988, the date this case was called for trial, petitioners filed a written motion to amend their petition. We denied this motion as untimely. At the close of trial, petitioners orally moved to amend their petition to conform to the evidence presented at trial. We denied petitioners' oral motion and directed petitioners to file a written motion. We also directed both parties to address the propriety of the amended petition in their briefs. In their subsequently filed written motion, petitioners claim that they are entitled to a net operating loss carryforward to the years in issue from 1980 and that they are also entitled to a net operating loss carryback to the years at issue from 1983. Under Rule 41, this Court has wide discretion to grant the parties leave to amend their pleadings and such leave is to be freely given "when justice so requires." Law v. Commissioner, 84 T.C. 985, 990 (1985). An untimely amendment should be denied, however, where no excuse for delay exists and there is prejudice or substantial inconvenience *179 to the adverse party. See Evans v. Syracuse City School District, 704 F.2d 44, 47 (2d Cir. 1983); Dunn v. Koehring Co., 546 F.2d 1193, 1198-1199 (5th Cir. 1977); Barrett v. Foster Grant Co., 450 F.2d 1146, 1149 (1st Cir. 1971). Petitioners' original written motion to amend their petition was filed on April 28, 1988, the day this case was called for trial. When questioned at trial, respondent's counsel stated that she was unprepared to litigate the issue. Based on respondent's representations at trial, we are convinced that respondent would be prejudiced if we were to permit petitioners to amend their petition so late in the proceedings. Accordingly, we deny petitioners' motion. [16]
*180 An appropriate order will be issued and decision will be entered under Rule 155. Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code, as amended and as in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.↩
2. Petitioners are entitled to employee business expense deductions in the amounts of $ 6,500 in 1981 and $ 2,000 in 1982 for legal fees paid during those years. Petitioners concede that $ 24,000 received from Elgin National Bank during 1982 represents severance pay and is to be included in income. ↩
3. An additional issue for decision is the amount of gain realized by petitioners in 1982 following the sale of the ENB stock. Due to a concession discussed at note 8, infra↩, resolution of this issue depends solely on the proper characterization of the amounts received from ENB following the stock sale.
4. Petitioners' 1981 income tax return reports employee business expenses of $ 100,681. Petitioners' 1982 income tax return reports employee business expenses of $ 93,469. Of this amount, $ 78,469 was reported as interest. Neither party has attempted to explain these discrepancies.↩
5. Although the issue in Miller v. Commissioner, 70 T.C. 448 (1978), arose under section 57, we noted that both sections 57 and 163(d) attempt to deal with the perceived abuse arising from the deductibility of interest paid on loans obtained to finance investments that will ultimately produce capital gains. Miller v. Commissioner, supra at 454, 455; see also King v. Commissioner, 89 T.C. 445, 461-462↩ & n.10 (1987).
6. Petitioners' 1982 return shows the cost of the ENB stock to be $ 1,123,660. The notice of deficiency reduced petitioners' basis to $ 751,947. The parties' settlement of the gain issue, see note 8, infra↩, appears to be consistent with the basis determined in the notice of deficiency and is also approximately 25 percent of the overall debt incurred by Mr. O'Rourke and his three associates. 7. Mr. O'Rourke shared the primary debt to ANB with his three associates, but he had joint and several liability for the entire amount.↩
8. The parties agree that if the $ 95,000 and the value of the automobile received from ENB in 1982 are not included in computing the gross sale proceeds from the sale of petitioners' stock, that petitioners' reportable gain on the sale of their ENB stock on January 18, 1982 is $ 106,159, resulting in an increase in taxable income of $ 38,096.↩
9. Though we find the terms of the January 18, 1982 agreement somewhat unclear, the parties in their briefs agree that Mr. O'Rourke's ENB stock was sold to Paul Olsen.↩
10. In light of our resolution of this issue, petitioners gain on the sale of ENB stock was $ 106,159, resulting in an increase in their taxable income for 1982 of $ 38,096. See note 8, supra↩.
11. Petitioners also argue that if the limitations contained in section 163(d) are applicable, then the nondeductible portion of the interest carried forward to 1982 should be used as an offset against investment income received in 1982, which necessarily includes the capital gain received following the stock sale. In support of this argument, petitioners argue that the Tax Reform Act of 1986, Pub. L. 99-514, sec. 511(a), 100 Stat. 2244, modified the definition of investment income contained in section 163(d) to include "any net gain attributable to the disposition of property held for investment." See sec. 163(d)(4)(B)(ii), as amended by the Tax Reform Act of 1986. The tax years currently before the Court are 1981 and 1982. The amendment discussed above applies to taxable years beginning after December 31, 1986. Tax Reform Act of 1986, Pub. L. 99-514, sec. 511(e), 100 Stat. 2249. Therefore, the statute as amended is inapplicable to the years in issue and we decline to consider this argument. ↩
12. We note that because dividends are earnings on investments, this argument cuts against petitioners' contention that Mr. O'Rourke's purchase of ENB stock was not motivated by investment purposes.↩
13. It should be noted that the November 16, 1981 minutes from the board of directors meeting also reveal that Mr. O'Rourke's successor received consultant fees of $ 2,186.25 for the month of October 1988.↩
14. Specifically, petitioners argue on brief that "What was unavailable for 1982 was any discussions from Paul Olson or the Elgin National Bank relative to the determination of what monies represented the sale price and what monies, if any, represented compensation for 1982. It was this information which was withheld from the taxpayer and which caused him to be unable to timely file the 1982 return."↩
15. On brief, petitioners admit that the value of the automobile received from ENB was not reported on their 1982 tax return, but claim that they thought their accountant, Mr. Spellmeyer, had included it in calculating the gain from the sale of stock. Petitioners cannot avoid imposition of the addition to tax for negligence because of their alleged reliance on Mr. Spellmeyer. We do not know the nature or extent of the information and explanations petitioners may have supplied to Mr. Spellmeyer. Mr. Spellmeyer did not sign the 1982 return as preparer, and he was not called as a witness. The duty of filing accurate returns cannot be averted by placing responsibility on an agent. Pritchett v. Commissioner, 63 T.C. 149, 174 (1974); Enoch v. Commissioner, 57 T.C. 781, 802-803↩ (1972).
16. Even if we were to allow the amended petition to be filed, petitioners have failed to establish the amount of any net operating losses. The tax returns for the purported loss years are the only evidence of the losses and do not prove the fact that the losses exist. The returns are merely statements of petitioners' claims and are insufficient, standing alone, to establish the facts contained therein. Wilkinson v. Commissioner, 71 T.C. 633, 639 (1979); Roberts v. Commissioner, 62 T.C. 834, 837 (1974); Seaboard Commercial Corp. v. Commissioner, 28 T.C. 1034, 1051↩ (1957). We note that petitioners' 1980 return claims a deduction for employee business expenses which is described as "Business Interest" in the amount of $ 110,217. This appears from the return to be the same type of deduction which was disallowed in 1981 and 1982 pursuant to section 163(d).