SUN MICROSYSTEMS, INC., & CONSOLIDATED SUBSIDIARIES, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Sun Microsystems v. Commissioner
Docket No. 8976-91
United States Tax Court
T.C. Memo 1993-467; 1993 Tax Ct. Memo LEXIS 475; 66 T.C.M. (CCH) 997; October 5, 1993, Filed *475 For petitioners: Andre M. Saltoun, Dennis I. Meyer, A. Duane Webber, and Wright H. Schickli. For respondent: Jeffrey L. Heinkel and Steven A. Wilson. TANNENWALD
TANNENWALD
MEMORANDUM FINDINGS OF FACT AND OPINION TANNENWALD, Judge: Respondent determined a deficiency in petitioners' 1987 Federal income tax return in the amount of 4,351,585. The issues relating to stock warrants (the warrants), the subject of this opinion, have been severed from certain other issues. Thus, the issue presented for our consideration is whether the warrants issued by petitioners, when exercised, constitute sales discounts the value of which is excludable from gross income or an expense deductible under section 162. [1]
FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts, the second stipulation *476 of facts, and the accompanying exhibits are incorporated herein by reference. Petitioner Sun Microsystems, Inc. (SMS), is a Delaware corporation with its principal office in Mountain View, California, at the time the petition was filed. SMS and its Consolidated Subsidiaries (petitioners) timely filed consolidated U.S. corporate income tax returns for the taxable year ended June 30, 1987, with the Internal Revenue Service Center, Fresno, California. For all relevant years, petitioners kept their books and records and filed their consolidated Federal income tax returns using the accrual method of accounting based on a taxable year ending June 30. Background
From its inception through 1987, SMS developed, manufactured, and sold computer workstations and related computer peripheral equipment primarily to universities, research laboratories, government agencies, engineers, engineering companies, and other individual companies and customers. In 1983, SMS's objective was to grow primarily by focusing its sales efforts on original equipment manufacturers (OEMs) [2] of computers and computer products, including OEMs that engaged in the computer-assisted design (CAD), computer-assisted *477 manufacturing (CAM), and computer-assisted engineering (CAE) business. Throughout 1983, SMS did not have any significant sales to OEMs. The only agreement SMS entered into on an OEM basis was in May 1983 with Interleaf, Inc. (Interleaf). Under the terms of the agreement, SMS agreed to sell workstations to Interleaf at an agreed-upon maximum purchase volume discount of 35 percent. SMS anticipated sales of between $ 200,000 and $ 300,000 pursuant to the agreement. At all relevant times, Computervision Corporation (CV) was an OEM engaged in the business of developing, producing, and selling computer hardware and software products in the CAD, CAM, and CAE field. In 1983, CV was one of the largest producers and sellers of CAE/CAD/CAM products in the world, with sales of over $ 400 million. The Negotiations
Prior to May 1983, CV sought to establish a long-term contractual relationship with a supplier for certain *478 computer workstations. CV solicited offers from SMS, IBM, and Apollo Computer, Inc. (Apollo). Only SMS and Apollo, an established company in the computer workstation industry and SMS's primary competitor, actually submitted offers to supply CV with computer workstations. SMS perceived that the opportunity to sell computer workstations to CV was vital to the successful development of its business because CV was the first potential OEM customer of significant size for SMS, and SMS needed large OEM customers to sustain its growth and establish further credibility in the industry. On May 9, 1983, SMS sent a letter to CV acknowledging that SMS was a start-up company compared to some of its competitors, and that there would be some inherent risk in choosing SMS for its workstation project. The most obvious risk, according to SMS, was its size and possible limits on its ability to produce a quality product in volume sufficient to meet CV's demands. The letter contained assurances that production capacity would be sufficient, but in the event that it was not, SMS granted manufacturing rights to CV which could be exercised under certain conditions. In addition, the letter explained *479 the company's discounting method: Discounts were based upon list price dollar volume and ranged from 36 to 40 percent for workstation purchases in the $ 10 million to $ 30 million range, and were 40 percent thereafter; an additional 5-percent cash discount was allowed for prompt payment. The letter summarized SMS's objectives as follows: Sun Microsystems, Inc. would like to establish Computervision as a flagship account by negotiating mutual business objectives in a spirit of close cooperation. In this way, we will each participate in the other's future success. * * * We are looking forward with high expectations toward the consummation of a meaningful commitment between both parties. * * *
On May 10, 1983, SMS responded to CV's vendor questionnaire in a letter which provided information relating to products, testing procedures, technical support, repair and maintenance policy, and manufacturing rights. In a third letter to CV, dated May 11, 1983, SMS acknowledged that risk minimization was a major decision criterion for CV in selecting a vendor. SMS outlined actions it was taking to minimize risk in the areas of field support, manufacturing, and product development. *480 The letter made reference to "the maximum Computervision discount (45%)" and provided the same schedule as in the letter of May 9. There was no mention of stock warrants in any of the three letters. By mid-May 1983, SMS was aware that CV had selected Apollo as its vendor, and that CV would not enter into a contract with SMS for the purchase of computer workstations. In light of the importance of the potential sales to CV, SMS continued aggressively to pursue a business relationship with CV. SMS believed that it had several problems in becoming a successful bidder for the CV contract: lack of credibility in the industry, small size, potential resistance to its proposal regarding the UNIX operating system, and considerable distance from CV. In June 1983, representatives of SMS and CV met in Chicago to work out an agreement. During the negotiations, CV sought to minimize the price at which it would purchase workstations by maximizing the discount from SMS's list price for such products. SMS sought to maximize the selling price of the workstations, and to minimize the amount of the discount from its list price. CV pressed for a higher discount although it was aware that, in the *481 computer industry, a 45-percent discount was on the high end of normal purchase discounts given by suppliers to OEMs. SMS did not think that it could make a cash profit if it would allow CV a discount greater than that offered. The parties discussed stock warrants during the negotiations as a means of affording CV greater discounts. The negotiations culminated in an agreement which was signed on or about June 17, 1983. The purpose of this agreement, entitled "Memorandum of Understanding for a Technology-Sharing Business Relationship" (memo of understanding), was to establish "guidelines and a basis for a long-term business relationship between Sun Microsystems, Inc. * * * and Computervision Corporation * * * for the joint development and manufacturing of intelligent workstation technology and designs." The memo of understanding, within which the May 11, 1983, proposal was integrated, provided that the relationship between SMS and CV would encompass the following areas: (1) An exchange of current product technologies; (2) cooperation on future product developments; (3) sharing of field support services and facilities; (4) investment participation in SMS by CV; and (5) the use of *482 mutually owned designs and manufacturing implementations. The terms regarding purchases of the workstations themselves were "subject to the terms and conditions of a separate OEM contract to be negotiated between the parties." With regard to CV's investment participation in SMS, the memo of understanding provided that SMS would grant to CV two stock warrants and a convertible debenture (the debenture). The first warrant was exercisable if, within a 36-month period, CV had transacted $ 20 million of business with SMS consisting of purchases of SMS-manufactured product plus royalties paid by CV. The second stock warrant was exercisable if CV's business reached a level of $ 30 million within the 36-month period. [3] CV and SMS regarded the warrants as an incentive for CV to purchase computer workstations from SMS. It is unlikely that the deal would have been consummated without that further inducement. *483 In addition, with respect to a $ 2.5 million loan made to SMS, the memo of understanding provided for the issuance of a 5 year, 8 percent, $ 1.5 million debenture convertible into 100,000 shares of SMS common stock, and $ 1 million note. [4]
The Agreements
On November 22, 1983, CV and SMS executed the following three agreements (the agreements): The purchase agreement, pursuant to which SMS agreed to sell and CV agreed to purchase certain workstations; the Agreement Relating to Investments by Computervision Corporation in Sun Microsystems, Inc. (the investment agreement), which related to the warrants and the convertible debenture *484 to be issued by SMS to CV; and the joint development agreement, which related to the joint development of certain computer products and provided for the $ 1 million loan referred to in the memo of understanding, see supra note 4. A. Purchase Agreement
Under the terms of the purchase agreement, as set forth in the section entitled "Volume Pricing Terms", CV was allowed an "across the board" discount of 40 percent on all purchase orders for the first 6 months, and after that, a maximum volume discount of 40 percent off list price, and an additional 5 percent cash discount for prompt payment. The purchase agreement, which ran for a period of approximately 3 years, contained no reference to the warrants. It also provided that "The Joint Development Agreement shall prevail over this Agreement". B. Issuance of the Stock Warrants
SMS agreed to issue two stock warrants to CV to provide a further incentive for an ongoing business relationship. The exercise of the first stock warrant was contingent upon CV's purchase of $ 20 million of products (including royalties paid by CV to SMS pursuant to the joint development agreement) within 36 months of the first shipment by *485 SMS to CV; the exercise of the second required $ 30 million of purchases within the same 36-month period. The stock warrants were exercisable in whole or in part at any time within 5 years after they first became exercisable. The investment agreement provided in relevant part: Recitals
Sun and CV have entered into a Joint Development Agreement of even date * * * providing for the sharing by the parties of certain technologies, for the manufacture by CV of certain reasonable workstation configurations ("RWCs") and for the purchase by CV from Sun of RWCs. In recognition of their mutual expectation of a continuing business relationship of value to both parties, CV has indicated its willingness to make certain loans to Sun and Sun has indicated its willingness to grant to CV an equity participation in Sun. * * * * 3. The Warrants. As additional incentive for an ongoing business relationship, Sun is issuing to CV (a) a warrant to purchase 10,000 shares of Sun's Series F Preferred Stock at a price of $ 120.00 per share, such warrant to become exercisable on the day after the Cumulative Sun Business with CV (referred to below) exceeds $ 20 million if such figure is reached *486 within 36 months of the date of the first shipment by CV of a First Generation RWC (as defined in the Joint Development Agreement) for revenue and (b) a warrant to purchase 10,000 shares of Sun's Series G Preferred Stock at a price of $ 150.00 per share, such warrant to become exercisable on the day after the Cumulative Sun Business with CV exceeds $ 30 million if such figure is reached within the 36 month period mentioned in (a) above. * * * Definitions of "Cumulative Sun Business with CV" and of the first shipment by CV of a unit for revenue appear below. 4. Cumulative Sun Business with CV. The Cumulative Sun Business with CV, which determines the exercisability of the Warrants as provided above, shall be the aggregate cumulative sum of (i) the amount of Sun's invoices (net of freight, insurance, duty, taxes and returned products) to CV for Sun products purchased by CV under the Purchase Agreement (as defined below), and (ii) royalties payable by CV to Sun pursuant to Section 5 of the Joint Development Agreement. * * * * (b) The shipment by CV of a First Generation RWC for revenue refers to the first bona fide regular way placement of such a unit by CV with an independent *487 customer, whether such unit be placed on sale or lease terms. The use by CV of units internally, including units used by its subsidiaries, shall not be regarded as shipments for revenue. CV will give Sun written notice of the date of the first shipment of such First Generation RWC for revenue within 30 days after such shipment. * * * * ANNEX II 10,000 Shares Series F/G Preferred Stock * * * * Preferred Stock Purchase Warrant SUN MICROSYSTEMS, INC. ("Sun"), a California corporation, hereby certifies that, for value received, COMPUTERVISION CORPORATION ("CV"), or permitted assigns, is entitled, subject to the terms set forth below, to purchase from Sun at any time or from time to time after the Initial Exercise Date and before * * * the Expiration Date, 10,000 fully paid and non-assessable shares of Series F/G Preferred Stock of Sun, at the purchase price per share of [$ 120/150] * * * This Warrant is one of the Preferred Stock Purchase Warrants (the "Warrants") issued in connection with an Agreement Relating to Investments by Computervision Corporation in Sun Microsystems, Inc. dated November 21, 1983 (the "Investment Agreement"). The Warrants evidence rights to purchase *488 an aggregate of 10,000 shares of Series G Preferred Stock of Sun * * *
From CV's perspective, the stock warrants were a mechanism by which the effective cost of the computer workstations purchased could ultimately be reduced to zero if the stock warrants increased in value. At the time of the negotiations and when the agreements were entered into, neither CV nor SMS knew whether the stock warrants would ever have any value, although CV thought that SMS would be successful. In the event that the warrants became exercisable and had value, it was not CV's intention to purchase or hold the stock of SMS. CV, in fact, did not acquire SMS stock pursuant to the warrants. The impact of securities laws was a factor in determining the provisions of the agreements. To ensure that the stock warrant transactions were exempt from the registration requirements of section 5 of the Securities Act of 1933 and the qualification requirements of the California Corporations Code, the representations and warranties regarding the warrants and the convertible debenture were set forth in a separate agreement. However, the agreements were viewed by the parties as a single integrated agreement. CV *489 was not aware of any other specific company in the computer industry that had issued warrants or similar noncash inducements to obtain an OEM customer; however, SMS knew of one other company which issued such warrants to a customer. SMS did not issue stock warrants to any of its other OEM customers, including Interleaf, TRW, Inc., and Eastman Kodak Company, over the period from 1983 through 1987. C. Convertible Debenture
Since its inception and through its fiscal year 1987, SMS's internally generated cash flow was not sufficient to support operations, to finance accounts receivable, inventories, and facilities, and to obtain necessary capital equipment. In addition, SMS was aware that the cost of taking on a customer the size of CV would be a significant expense. For example, it would need to expand and to hire additional people to accommodate increased production demands. During its 1984 fiscal year, SMS had an unsecured working line of credit pursuant to which it could borrow up to $ 8 million at a rate of interest equal to prime plus .75 percent. SMS also had a $ 3 million loan commitment from banks that provided for interest equal to the prime rate plus 1 percent. *490 The prime rate in May and June 1983 was 10.5 percent, and on December 2, 1983, was 11 percent. During its negotiations with CV, SMS tried to obtain $ 5 million of financing from CV. CV, which had a large cash reserve, would only agree to loan $ 2.5 million to SMS; this financing consisted of a $ 1.5 million convertible debenture which was subordinated to "all Sun's Senior Indebtedness" and a $ 1 million note. The investment agreement defined "Senior Indebtedness" as: the principal of (and premium, if any) and unpaid interest on, (i) indebtedness of Sun, whether outstanding on the date hereof or hereafter created, to banks, leasing companies, insurance companies or other lending institutions, regularly engaged in the business of lending money, which is for money borrowed by Sun or a subsidiary of Sun, whether or not secured, for equipment leased by Sun or a subsidiary of Sun and (ii) any deferrals, renewals or extensions of any such indebtedness.
The debenture was also not entitled to a sinking fund. The terms of the debenture, issued on December 1, 1983, required SMS to pay $ 1.5 million to CV on or before December 1, 1988, with interest accruing on the unpaid balance *491 at the rate of 8 percent per year. The principal amount of the debenture was convertible into SMS's Series G Preferred Stock at a price equal to $ 150 per share. The debenture was another means for CV to potentially reduce the effective cost of its purchases from SMS if SMS's stock increased in value and CV converted the debenture to stock. CV acquired common stock in conjunction with the debenture and recognized gain on the sale of that stock in 1986 and 1987. D. Technology Exchange
SMS possessed valuable technology and know-how with respect to the operation of UNIX, a nonproprietary, open computer operating system that was compatible with computer hardware and software developed by other companies. CV did not have experience with this operating system, and previously sold products based only upon its own closed, proprietary operating systems. Moreover, CV intended to develop software for future products, and it was necessary for CV to coordinate this advancement with the development of the workstations by SMS. Further, in order to facilitate the use of SMS's workstations with CV's existing product line, the parties had to develop an appropriate interface between the *492 systems. They also agreed to contribute mutually to the design of superseding generations of intelligent workstation products which would be jointly owned by CV and SMS. To achieve their objectives, the parties agreed to broadly share all current product information and knowledge relating to development of future products, and to exchange specific items such as hardware and software. The joint development agreement contained detailed provisions implementing the objectives of the parties. It specified the royalties to be paid by CV, for SMS's technology. It also gave CV the right to manufacture workstations if SMS did not supply them under the purchase agreement. Finally, although there was no commitment to purchase any minimum volume of workstations, CV agreed to purchase 50 percent of its workstation requirements from SMS during the 3-year term of the purchase agreement. Exercise of the Stock Warrants
On March 4, 1986, SMS made its initial public offering of its common stock. Thereafter, pursuant to the agreements, each share of the SMS preferred stock covered by the stock warrants issued to CV was converted into 15 shares of SMS common stock. Thus, for each of the *493 2 stock warrants, CV had the contingent right to purchase 150,000 shares of SMS common stock. The first warrant to purchase common stock (at $ 8 per share) became exercisable in the fourth quarter of SMS's 1986 fiscal year (i.e., April through June 1986) and was exercised on November 24, 1986. On that date, CV sold its rights to the first warrant to an underwriter, who then exercised the first warrant. The fair market value of the SMS stock on November 24, 1986, was $ 19.375, $ 11.375 per share greater than the $ 8.00 per share exercise price. In January 1987, the second warrant became exercisable by CV. CV sold its rights to the second warrant to an underwriter on March 12, 1987, when the fair market value of SMS stock was $ 31.375 per share, $ 21.375 greater than CV's $ 10.00 per share exercise price. Tax and Accounting Treatment of the Stock Warrants
In their consolidated U.S. Corporation Income Tax Return (Form 1120) for 1987, petitioners claimed a deduction in the total amount of $ 4,912,500 with respect to the warrants issued to CV. This amount was calculated on the basis of the difference between the total value of the SMS stock issued to the underwriter upon *494 the exercise of the stock warrants and the total amount paid by the underwriter for such shares. The amount was computed as follows: $ 1,706,250 (150,000 shares x $ 11.375) with respect to the exercise of the first warrant, plus $ 3,206,250 (150,000 shares x $ 21.375) in connection with the exercise of the second warrant. In its tax return, petitioners characterized the $ 4,912,500 deduction as a "Stock Warrant Deduction". However, this deduction was not reflected as an expense in petitioners' 1987 financial statements. In petitioners' Schedule M-1, the $ 4,912,500 deduction was reported as a deduction for tax not charged against book income. Nature of the Relationship Between SMS and CV
At the time that the parties entered into the agreements, both parties viewed their new relationship as potentially long-term. To CV, the change from a proprietary system to the UNIX system was a significant strategic change. To SMS, an agreement with one of the largest producers and sellers of CAE/CAD/CAM hardware and software products in the world was vital to the successful development of its business. Although CV did not commit to buying the volume specified in the investment agreement, *495 [5] it indicated to SMS that "that was going to happen". SMS perceived that the relationship with CV might be a "company maker" or flagship account. CV was a very prestigious company. It was the market leader in the CAD industry at that point in time. It had a history of manufacturing its own underlying computing technology. Essentially, CV was a large company which selected SMS as a business partner to build its products. SMS hoped that the increase in its sales volume would build its company, build its manufacturing capacity, provide it with the credibility necessary for it to become a major participant in the computer industry, and permit it to begin the implementation of the next stage in its rapid growth strategy. SMS also hoped to make some money on sales to CV, although it did not know how much that would be. If SMS was successful, CV's investment could ultimately lower its product cost to zero. If SMS did not succeed, at worst, CV would lose its loan but would still retain full *496 manufacturing and technology rights to the product. After securing the agreements with CV, SMS began selling computer workstations and related peripheral products to numerous OEMs including TRW and Eastman Kodak. Maximum volume pricing discounts of between 33 percent and 38 percent were allowed to these large OEMs. SMS experienced a growth in yearly sales from $ 8.7 million in 1983 (prior to the commencement of sales to CV) to over $ 537 million in 1987. OPINION We must determine the correct tax treatment of the warrants issued by SMS to CV. Petitioners contend that the value of the warrants, i.e., the excess of the value of SMS stock over the exercise price (an amount which is not in dispute), constitutes a sales discount or allowance, excludable from gross sales or, alternatively, an ordinary and necessary business expense deductible under section 162. Respondent contends that such value was not a sales discount or allowance, but rather represented an "investment opportunity" for CV, with the result that it is neither excludable from gross sales as a sales discount or allowance nor deductible under section 162. Initially, we note that respondent has renounced any claim that *497 section 1032 applies so as to deny SMS the tax benefit flowing from either of its positions. Cf. Duncan Industries, Inc. v. Commissioner, 73 T.C. 266, 282-283 (1979). Nor does respondent contend that the warrants (or the stock issued pursuant to their exercise) are not property which can be the subject of a sales discount or allowance or a deductible expense.[6] See Hollywood Baseball Association v. Commissioner, 42 T.C. 234, 270-271 (1964), affd. 352 F.2d 350 (9th Cir. 1965), vacated on other grounds 383 U.S. 824 (1966). Finally, the parties are in agreement that, because of the contingent nature of the warrants, 1987 is the earliest year, under the all-events test, for determining their tax consequences. Since by that time the contingencies had occurred in that CV had purchased the requisite dollar amount of workstations, respondent's passing reference to the clear-reflection-of-income test falls by the wayside unless we determine that the warrants represented consideration for benefits to SMS in later years. *498 Essentially, petitioners' position is based on the proposition that, since the purpose of the warrants was to reduce the cost of a customer's purchases, the value of the warrants must necessarily be a sales discount or allowance or a deductible expense. Respondent's position is equally categoric, namely, that the issuance of the warrants represents an "investment opportunity" which is capital in nature and therefore precludes characterization of their value at the time of exercise as a sales discount or allowance or a deductible expense. Our view differs from the simplistic positions adopted by the parties and derives from an analysis of the totality of the facts and circumstances of the relationship between SMS and CV in order to determine the intent and purpose of the parties and thus proper tax treatment of the item in question. The parties have focused on our pronouncement in Pittsburgh Milk Co. v. Commissioner, 26 T.C. 707, 716-717 (1956): It does not follow, of course, that all allowances, discounts, and rebates made by a seller of property constitute adjustments to the selling prices. Terminology, alone, is not controlling; and each type *499 of transaction must be analyzed with respect to its own facts and surrounding circumstances. Such examination may reveal that a particular allowance has been given for a separate consideration -- as in the case of rebates made in consideration of additional purchases of specified quantity over a specified subsequent period; or as in the case of allowances made in consideration of prepayment of an account receivable, so as to be in effect a payment of interest. The test to be applied, as in the interpretation of most business transactions, is: What did the parties really intend, and for what purpose or consideration was the allowance actually made? Where, as here, the intention and purpose of the allowance was to provide a formula for adjusting a specified gross price to an agreed net price, and where the making of such adjustment was not contingent upon any subsequent performance or consideration from the purchaser, then, regardless of the time or manner of the adjustment, the net selling price agreed upon must be given recognition for income tax purposes.
See also Max Sobel Wholesale Liquors v. Commissioner, 630 F.2d 670 (9th Cir. 1980), affg. *500 69 T.C. 477 (1977). While we agree that the Pittsburgh Milk test is relevant to our inquiry herein, we think it is important to note that is not the determinative standard for decision. Thus, we think it should be recognized that, in Pittsburgh Milk, we were required to determine how to treat an item which clearly represented an adjustment to income, either "above the line" or "below the line". The issue herein is quite different, namely, whether any adjustment to income is in order or whether the amount in question should be treated as a capital item and therefore not the subject matter for any such adjustment. Several elements of the arrangements between SMS and CV must be examined in order to dispose of this issue. We first note that the subject matter of the adjustment herein is warrants for the purchase of stock. Respondent's concession as to the nonapplicability of section 1032, see supra p. 19, does not preclude taking into account the fact that stock, rather than some other type of property, i.e., cash or merchandise, was used and that stock conveys an aura of investment. Clearly, however, this fact standing alone is not determinative *501 and, indeed, is of only minor significance. See secs. 83, 422; Commissioner v. LoBue, 351 U.S. 243 (1956) (recognizing the compensatory rather than proprietary aspect of employee stock options). Respondent attaches great importance to the fact that the warrants were dealt with as an "investment participation" by CV in SMS and were grouped with the note and debentures representing capital transactions, i.e., loans from CV to SMS, not only in the memo of understanding but also in the investment agreement, rather than in the purchase agreement covering the purchase of the workstations. While we recognize that this factor cannot be ignored, we do not give it the same weight as respondent. Whatever significance might otherwise attach to respondent's form-over-substance argument, it is counteracted by the totality of the facts and circumstances, which we consider the proper standard to be applied herein, and particularly by the stipulations of the parties that the various elements of the arrangements between CV and SMS were integrated and that the inclusion of the note, debenture, and warrants in the same agreement represented simply a more convenient *502 way to deal with the requirements in Federal and State law relating to the issuance of securities. [7]
*503 Respondent further asserts that the arrangement cannot qualify under the Pittsburgh Milk test because it (1) did not provide a formula for "an agreed net price" and (2) was "contingent upon * * * subsequent performance or consideration from" CV. See supra p. 21. In support of her position, respondent points to the fact that the claimed sales discount or allowance was dependent upon the value of the warrants at a future date, namely, when CV had purchased the requisite dollar amounts of workstations and that, since that value was speculative, there could not be "an agreed net price". In respect of the contingent performance, respondent points to the fact that the exercise of the warrants was not only dependent upon the purchase by CV of the designated amounts of workstations, which was optional [8] with CV, but also upon CV's payment for the stock represented by the warrants. *504 We are not persuaded as to the correctness of respondent's positions. In the first place, we do not view Pittsburgh Milk as creating an exclusive test for determining the existence of a sales discount or allowance. We think that Pittsburgh Milk merely states that, if the elements enunciated therein are the only elements present, that will be enough to sustain the existence of a sales discount or allowance. Pittsburgh Milk did not say the presence of these elements is enough irrespective of other facts, nor did it say that the literal language of the test must be satisfied. In our opinion, a specified dollar amount at the inception of a purchase arrangement is not a necessary ingredient of an "agreed net price". Cf. Max Sobel Wholesale Liquors v. Commissioner, supra, where the discount was represented by additional merchandise whose value clearly could fluctuate. It is enough if a mechanism for establishing such a price is established in the arrangement. That is what occurred here. To be sure, the mechanism left the determination of the dollar amount to future events, and such amount could vary from zero to a very large figure *505 depending on the value of SMS stock over the exercise price. But we are not persuaded that a potentially large amount necessarily precludes characterization as a sales discount or allowance.[9] Although an adjustment to income under such circumstances conceivably could reduce a taxpayer's taxable income to zero or even to a negative figure, the fact of the matter is that, from a financial point of view, the earnings of the taxpayer would not be affected since the issuance of the stock would represent a nonexpenditure item which would be reflected as capital on the balance sheet. When this factor is taken into account along with the fact that the appropriate time to evaluate the arrangement is at its inception, it is difficult to conclude that the reasonableness of the amount involved was so open to question as to cause it to lose characterization as a sales discount. Cf. Potter Electric Signal and Mfg. Co. v. Commissioner, 286 F.2d 200, 202-203 (8th Cir. 1961), affg. T.C. Memo. 1960-30 (reasonableness is relevant only in determining whether the amount is in fact paid for the use of property and is not per se a condition *506 for a deduction).
As far as the elements of performance are concerned, the need for CV to purchase the designated dollar amount of workstations is an element of performance present in every volume discount arrangement. Similarly, the facts that the warrants had to be exercised and the warrant price paid are no different from the conditions attaching to warrants and stock options generally. If respondent's position in this regard were valid, even though a stock bonus could be a discount, a stock warrant or option could not; this, in our opinion, would create an unjustifiable distinction. Moreover, from SMS's point of view, the exercise of the warrants as such offered no assured source of capital since there was no guaranty that CV would purchase the requisite dollar *507 amount of workstations and, in any event, it does not appear that SMS required any further capital beyond that obtained from other sources, including the note and the convertible debenture. As far as CV was concerned, the exercise of the warrants presented no need for the use of other funds. The purchase price specified in the warrants could be realized, upon exercise, through the sale of a portion of the stock received. Alternatively, the value of the warrants could be realized by CV without the outlay of any funds by CV by their sale prior to exercise, which is precisely what occurred herein. Respondent suggests that the warrants were part of an arrangement that involved a joint technology development program between SMS and CV and therefore should not be treated as a sales discount or allowance in respect of the purchase of workstations. The difficulty with this position is that, as far as the record herein shows, the flow of technology was expected to, and did, move from SMS to CV with only a small, insignificant share moving from CV to SMS. Such being the case, we are unwilling to tie the warrants to the joint technology development arrangement. Moreover, as previously *508 noted, see supra note 8, the joint technology development agreement linked the provision of technology by SMS to CV to the purchase of workstations by CV. In a similar vein, we reject respondent's attempt to relate the warrants to what she claims were the favorable financial terms of the note and convertible debenture. The stipulations of the parties, see infra note 13, and the testimony of the officials of SMS and CV stand as clear rebuttal to the assertion that the warrants were related in any way to the note or the debenture. Respondent also points to the fact that the computation of the $ 20 million and $ 30 million amounts, upon which the exercise of the warrants depended, included not only the amount of the sales but also the amount of royalties paid by CV to SMS and the amount of any orders by CV which SMS did not fill. We view these incidental items [10] as not having any effect on the determination of the intent and purpose of the warrants. *509 Finally, we must consider the extent to which the warrants should be attributed to the development of a long-term customer relationship with CV and should be capitalized in accordance with the "new look", which respondent asserts has been accorded the issue of business expense versus capital expenditure by the Supreme Court in INDOPCO, Inc. v. Commissioner, 503 U.S.    , 112 S.Ct. 1039 (1992). We find it unnecessary to refine this claimed "new look" for the purpose of our decision herein. In the first place, INDOPCO stands primarily for the proposition that a separate asset is not necessary in order to characterize a payment as a capital expenditure. In the second place, INDOPCO articulated this proposition in the context of a situation which clearly involved a capital transaction. Finally, the Supreme Court recognized that, while realization of future benefits is important in determining existence of a capital expenditure, "the mere presence of an incidental future benefit -- 'some future aspect' -- may not warrant capitalization". INDOPCO, Inc. v. Commissioner, 112 S.Ct. at 1044-1045. Our evaluation *510 of the record herein, including particularly the stipulations of the parties [11] and the testimony of the officials of SMS and CV involved in the negotiations, clearly shows that the warrants were included as an incentive to purchase $ 20 million and $ 30 million worth of workstations. We especially note that stipulation 85 specifies that "the anticipated long-term benefits to SMS from the relationship with CV were 'softer' and were speculative, compared to the immediate benefits to SMS of the anticipated sales of computer workstations to CV under the Purchase Agreement". [12]
*511 We conclude that the instant situation falls within the "incidental future benefit" category reflected in INDOPCO. Cf. Snyder v. United States, 674 F.2d 1359, 1365 (10th Cir. 1982) (author's expenses in connection with a book to be published in future held deductible); Primuth v. Commissioner, 54 T.C. 374 (1970) (fee in order to secure employment held deductible); Rev. Rul. 92-80, 1992-2 C.B. 57 (INDOPCO does not preclude deduction of advertising expenses having a future benefit); see Lee, "Doping out the Capitalization Rules after INDOPCO", 57 Tax Notes 669 (Nov. 2, 1992); Note, "Deductibility of Takeover and Non-Takeover Expenses in the Wake of Indopco", 45 Tax Law. 815 (1992). Indeed, the long-term benefits herein appear to be no different than those present in stock options given to employees which were held not to impair their compensatory character even before the enactment of the statutory framework that now exists. See Commissioner v. LoBue, supra; Union Chemical & Materials Corp. v. United States, 155 Ct. Cl. 540, 296 F.2d 221 (1961). *512 In sum, the hard fact is that the stipulations of the parties [13] and the testimony of officials of SMS and CV involved in the negotiations clearly show that the warrants were included as an incentive to the purchase of the workstations and not a capital item. This conclusion is reinforced by the fact that the parties have stipulated that CV "did not intend to purchase or hold the stock of SMS if the Stock Warrants became exercisable and had value" (see supra note 13), and that CV sold the warrants within a very short time after they became exercisable. *513 Based on an evaluation of all the facts and circumstances, we conclude that the value of the warrants represented a sales discount or allowance by SMS to CV. In so concluding, we find it unnecessary to deal with the various authorities cited by the parties that we have examined and determined not to have any significant bearing on our factually intense disposition herein. In view of our conclusion, there is no need for us to cut through the thicket of the decided cases dealing with the meaning of "ordinary and necessary" in order to determine whether the value of the warrants constitutes an ordinary and necessary business expense under section 162. See Brizell v. Commissioner, 93 T.C. 151 (1989); 1 Bittker and Lokken, Federal Taxation of Income, Estates, and Gifts, sec. 20.3.2 (2d ed. 1989). An appropriate order will be issued. Footnotes
1. All statutory references, unless otherwise indicated, are to the Internal Revenue Code in effect for the year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.↩
2. An OEM is a company that buys others' computers for enhancement and resale under its own name.↩
3. The Memo of Understanding provided in relevant part: (E) Investment participation in Sun by CV . Warrants (5 year) a) On 100,000 shares of common stock at $ 12.00/share, exercisable after CV has received $ 20 million of Sun-manufactured product plus royalties paid by CV within 36 months of 1st production CV delivery for revenue. b) on 100,000 shares of common stock at $ 15.00/share exercisable after CV has received $ 30 million of Sun-manufactured product plus royalties paid by CV within 36 months of 1st production CV delivery for revenue.↩
4. The Memo of Understanding provided in relevant part: . Debenture A $ 1.5 million debenture (5 year, 8%) convertible into 100,000 shares of common stock, in conjunction with a $ 1.0 million loan at 8%, such loan to be repaid quarterly at the rate of 10% of the previous three months invoices to CV until the loan is repaid in full. (i.e. after $ 10 million in invoices)↩
5. See infra↩ note 8.
6. Stipulation 98 reads as follows: 98. If the Court otherwise determines that Petitioners are entitled to a reduction in gross income or a deduction under section 162 with respect to the Stock Warrants, Respondent will not argue or assert that such reduction in gross income or deduction under section 162↩ is not allowable because it was paid with stock.
7. The stipulations read as follows: 30. SMS and CV negotiated the various terms of the relationship between the parties as a single agreement. Thereafter, for securities law reasons and for organizational reasons determined by the attorneys that negotiated the specific language of the agreement, the overall agreement was reflected in three separate agreements. * * * * 32. The three agreements referred to in the immediately preceding paragraph (hereinafter referred to collectively as the "Agreements") were related, and were negotiated and executed simultaneously. The parties viewed the three agreements as a single integrated agreement. * * * * 34. Securities laws issues were an important factor in determining the organization and provisions of the Agreements. Certain representations and warranties by CV were required in order to ensure that the Stock Warrant transactions were exempt from (i) the registration requirements of Section 5 of the Securities Act of 1933, and (ii) the qualification requirements of the California Corporations Code. Similar requirements applied to the convertible debentures. In addition, it was customary for a company to make certain representations regarding transactions that involved stock or related instruments. As a practical matter, it was simpler and more appropriate to reflect these representations and warranties, along with other customary representations, restrictions, and registration rights, in one agreement that included both the Stock Warrants and the convertible debentures.↩
8. Stipulation 35 of the stipulation of facts provides: 35. CV did not provide SMS with any guarantee or commitment to purchase any minimum volume of computer workstations pursuant to the Agreements.↩
We note, however, that the joint technology development agreement implemented a provision of the Memorandum of Understanding, by providing, in paragraph 4.2, that CV would purchase from SMS 50 percent of its requirements for workstations during the 3-year term of that agreements, which was co-extensive with the 3-year term of the purchase agreement.
9. In the instant case, the amount claimed as a discount by SMS is $ 4,912,500 against discounted sales of $ 30 million to CV, gross sales of $ 459,556,429, gross profit of $ 226,694,139, and taxable income of $ 42,211,832 for the taxable year at issue.↩
10. The record is silent as to the amount of the royalties paid and there is no claim that any unfilled orders were involved.↩
11. See infra↩ note 12.
12. The full text of stipulation 85 reads as follows: 85. SMS sought a long-term relationship with CV, and viewed the Agreements with CV as a potential long-term relationship. SMS perceived that this relationship might be a "company maker" or flagship account. However, at the time of the Agreements, it was uncertain whether the relationship would be successful, whether SMS could fully perform under the Agreements, and whether SMS would become a successful company. Thus, the anticipated long-term benefits to SMS from the relationship with CV were "softer" and were speculative, compared to the immediate benefits to SMS of the anticipated sales of computer workstations to CV under the Purchase Agreement.
A further indication of the fact that the warrants were at most incidentally an incentive for the establishment of a long-term relationship between SMS and CV is contained in stipulation 88 which reads as follows: 88. From 1983 through 1987, there was no guarantee or assurance that the relationship between SMS and CV would continue, or that CV would continue to purchase products from SMS. CV had the right, subject to the terms of the Joint Technology Agreement, to produce the same products that it purchased from SMS. Moreover, CV was free to purchase computer workstations from other competitors (e.g.↩, IBM, NEC, Apollo, or other competitors). [Emphasis added.]
13. Among the stipulations are the following: 22. In May 1983, SMS offered a package of incentives to CV as part of its new offer to supply the workstations to CV. * * * * 28. During the negotiations between CV and SMS, CV sought to minimize the price at which it would purchase workstations from SMS by maximizing the dicount from SMS's list price for such products. SMS sought to maximize the price at which it sold workstations, and to minimize the amount of the discount from its list price. * * * * 40. CV and SMS regarded the Stock Warrants as an incentive for CV to purchase computer workstations from SMS. 41. CV and SMS regarded the Stock Warrants as a mechanism which could potentially reduce the effective cost to CV of the computer workstations that CV purchased from SMS. 42. The Stock Warrants were "part and parcel" of CV's purchase of workstations from SMS. 43. From CV's perspective, the stock warrants were a mechanism by which the effective cost of the computer workstations purchased by CV could be reduced if the Stock Warrants increased in value (i.e., if SMS's stock increased in value). * * * * 45. CV and SMS intended that if SMS's stock increased in value, the Stock Warrants would provide an opportunity for CV to reduce the effective cost of the computer workstations that CV purchased from SMS. * * * * 47. CV viewed the Stock Warrants as an opportunity to reduce the cost of the workstations purchased from SMS if the value of the Stock Warrants increased (i.e.↩, if the value of the SMS stock increased), and did not intend to purchase or hold the stock of SMS if the Stock Warrants became exercisable and had value.