T.C. Memo. 1998-317


UNITED STATES TAX COURT


CUSTOM CHROME, INC. AND SUBSIDIARIES, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 5530-96.                    Filed September 2, 1998.


James J. Kelly, Jr. (an officer), and <u>Harry J. Kaplan</u>, for petitioner.

<u>Lloyd T. Silberzweig</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

SWIFT, <u>Judge</u>:  For the years in issue, respondent determined deficiencies in and penalties to petitioner Custom Chrome, Inc.'s and its consolidated subsidiaries' Federal income taxes as follows:

| Tax Year Ending | Deficiency | Accuracy-Related Penalty Sec. 6662(a) |
|---|---|---|
| Jan. 31, 1992 | $1,320,879 | $264,404 |
| Jan. 31, 1993 | 1,472,023 | 294,244 |
| Jan. 31, 1994 | 778,098 | 155,244 |

Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

Following concessions, the primary issues for decision are: (1) Whether $5 million paid to a stockholder constitutes an amortizable business expense for a covenant not to compete or a nondeductible capital expenditure; (2) whether $1,199,000 paid to employees constitutes currently deductible payments for services rendered or nondeductible payments for a covenant not to compete amortizable only in years not before the Court; (3) whether other claimed business expenses constitute nondeductible capital expenditures; and (4) the value of options issued on August 25, 1989, for purposes of calculating original issue discount associated with a loan.

## FINDINGS OF FACT

Some of the facts are stipulated and are so found. When the petition was filed, petitioner's principal place of business was located in Morgan Hill, California.

In 1970, petitioner was incorporated by several individuals to operate a small independent retail store selling motorcycle parts and accessories.

In 1975, two employees of petitioner, Tyrone A. Cruze, Sr. (Cruze) and Ignatius J. Panzica (Panzica) purchased the stock of petitioner.  In December of 1976, Cruze became sole owner of the stock of petitioner,[1] and Panzica stayed on as an employee.

From 1976 until 1991, under Cruze's direction as sole stockholder, president, and chief executive officer of petitioner, petitioner's business thrived, and petitioner became the largest independent worldwide supplier of Harley-Davidson motorcycle parts and accessories.  Petitioner's employees also designed and manufactured many of the accessories that it sold for Harley-Davidson motorcycles.

Petitioner maintained warehouse facilities in California and Kentucky.  In 1989, petitioner's combined domestic and foreign sales exceeded $28 million.

From 1976 until 1991, Cruze was involved in and maintained final decision-making authority over all aspects of petitioner's business operations.  Cruze established significant business contacts with bankers, suppliers, and vendors who were important to the business operations and success of petitioner.  Cruze was

---

[1]     Cruze's wife also purchased some of the stock in petitioner.  For convenience, we treat Cruze as sole owner of the stock in petitioner.

well known and respected in the motorcycle parts business, and his ideas, efforts, and management skills contributed significantly to the growth and success of petitioner.

From 1976 until 1991, Panzica served as petitioner's vice president of operations. In 1991, Panzica succeeded Cruze as chief executive officer of petitioner.

From approximately 1975 until the mid-1990's, Mario Battistella managed warehouse operations for petitioner.

From 1985 until August of 1989, Dennis B. Navarra was vice president of finance for petitioner. In 1989, Navarra became chief financial officer and assistant secretary for petitioner.

During the 1980's, Panzica, Battistella, and Navarra were underpaid by petitioner for their significant services as employees of petitioner.

In 1988, Cruze began considering selling his stock in petitioner.

In late 1988 or early 1989, the Jordan Company (JC Investors), a New York City investment firm, approached Cruze regarding the potential purchase of his stock in petitioner. JC Investors was in the business of purchasing private companies and taking the companies public. In 1989, JC Investors owned substantial interests in over 25 private companies in various industries with aggregate annual sales of $1.5 billion. Generally, after acquiring controlling interests in companies,

JC Investors would retain existing management personnel of acquired companies and would require key employees of the companies to enter into covenants not to compete.

In 1989, after significant negotiations, JC Investors agreed to purchase from Cruze for $16.75 million all of the outstanding stock in petitioner. The stock purchase was structured as a leveraged buyout (LBO).

In order to carry out the LBO, JC Investors organized Custom Chrome Holdings, Inc. (CC Holdings), as a wholly owned subsidiary. On May 24, 1989, a stock purchase agreement between Cruze and CC Holdings was entered into under which Cruze was to be paid $16.75 million in consideration for his stock in petitioner.

On August 15, 1989, JC Investors organized Custom Chrome Acquisition Corp. (CC Acquisition), as a wholly owned subsidiary of CC Holdings. CC Acquisition was incorporated 10 days prior to the LBO for the sole purpose of facilitating the LBO. During its 10-day existence, CC Acquisition did not conduct any activities unrelated to the LBO.

In August of 1989, CC Acquisition obtained from First National Bank of Boston (FNBB) a $26 million loan in order to finance the LBO and to provide working capital for petitioner after the LBO. The $26 million obtained from FNBB by

CC Acquisition was made available to CC Acquisition under 3 lines of credit with various interest rates and terms, as follows:

| Lines of Credit | Amount | Interest Rate | Term |
|---|---|---|---|
| Tranche I | $9,000,000 | Prime Plus 2.0% | 5 Years |
| Tranche II | 9,000,000 | Prime Plus 1.5% | 7 Years |
| Working Capital | 8,000,000 | Prime Plus 1.5% | 5 Years |

By selling debentures issued by CC Holdings to Mezzanine Capital and Income Trust (Mezzanine Capital), CC Holdings obtained an additional $7 million to assist in financing the LBO. Prior to the LBO, CC Holdings contributed to CC Acquisition the $7 million received from sale of the debentures along with an additional $500,000 that CC Holdings had raised through sale of its stock.

The following schedule summarizes the source and amount of funds obtained by JC Investors through its two controlled corporations, CC Acquisition and CC Holdings, in connection with the LBO:

| Source of Funds | Amount |
|---|---|
| FNBB Line of Credit | $26,000,000 |
| Sale of Debentures to Mezzanine Capital | 7,000,000 |
| CC Holdings Contribution | 500,000 |
| Total | $33,500,000 |

On August 25, 1989, pursuant to the plan of acquisition and using the funds that had been obtained by CC Acquisition, CC Holdings acquired Cruze's stock in petitioner in an LBO that, for Federal income tax purposes, took the form of a taxable reverse

subsidiary merger. Simultaneous with the acquisition by CC Holdings of Cruze's stock in petitioner, CC Acquisition was merged into petitioner with petitioner surviving the merger.

As a result of the reverse merger, CC Acquisition did not remain in existence, and petitioner became a wholly owned subsidiary of CC Holdings.

According to the plan of acquisition and under the merger agreement, petitioner became liable for debts of CC Acquisition, including the $26 million loan obtained from FNBB. The $16.75 million used to pay Cruze for the stock in petitioner was part of the $26 million received as a loan from FNBB.

After the LBO and under various supplemental agreements relating to acquisition of the stock in petitioner and to the continued employment of the senior employees of petitioner, Mezzanine Capital and Panzica, Battistella, Navarra, and other employees of petitioner acquired shares of stock in CC Holdings for $500 per share.

Further, on August 25, 1989, in connection with the $26 million loan made by FNBB, FNBB received from CC Holdings options to purchase, over the course of 10 years, shares of stock in CC Holdings representing up to 12.5 percent of the equity in CC Holdings. The options will expire on August 31, 1999, and the exercise price was set at $500 per share, the same price per

share paid by investors who acquired stock in CC Holdings as part of the LBO of petitioner.

Terms of the agreement under which FNBB received options to acquire stock in CC Holdings for $500 per share were hotly negotiated between JC Investors, CC Holdings, and FNBB. Financing the LBO posed significant risks for FNBB. Approximately $9 million of the $26 million loan made available by FNBB was not secured. The LBO would change petitioner's capital structure from primarily equity to primarily debt. In recognition of such risks, the options provided FNBB the potential to earn significant additional income if the stock of CC Holdings increased in value. FNBB loan officers estimated that the options might have a value in 5 years of approximately $5 million.

Immediately following the LBO transaction and under the various supplemental agreements, the common stock (or in the case of FNBB options to acquire common stock of CC Holdings) was owned as follows:

| Stockholders | Percentage Ownership In CC Holdings |
|---|---|
| JC Investors | 28.500 |
| Mezzanine Capital | 28.500 |
| Cruze, Panzica, Battistella, and Navarra | 24.625 |
| FNBB (options) | 12.500 |
| Other Employees of Petitioner | 5.375 |
| Miscellaneous | .500 |
| Total | 100.000 |

Because of restricted voting rights associated with many of the above shares, JC Investors controlled the board of directors of petitioner. Also, after the LBO and consistent with JC Investors' practice, petitioner's management team and senior employees were asked to and did remain with petitioner.

Further, consistent with JC Investors' practice in acquiring companies, Cruze, as key employee of petitioner, was requested to enter into a covenant not to compete. Under the covenant not to compete that Cruze entered into with petitioner, for an additional $5 million that was paid to Cruze in 1989 upon closing of the LBO, Cruze was obliged for a 3-year period of time from the date of the LBO not to enter into any business contract that would compete directly or indirectly with petitioner's business. JC Investors likely would not have agreed to the purchase of the stock in petitioner if Cruze had not signed this covenant not to compete.

On August 25, 1989, an additional $2,589,759 was paid to Cruze to enable him to pay certain Federal income taxes that were owed by petitioner and that related to years prior to the LBO when petitioner had constituted an S corporation.

The following schedule reflects total funds received by Cruze on August 25, 1989, in connection with the LBO:

| Funds Received Relating To | Amount |
|---|---|
| Outstanding Stock | $16,750,000 |
| Covenant Not to Compete | 5,000,000 |
| Petitioner's Taxes | 2,589,759 |
| Total | $24,339,759 |

Also, upon closing of the LBO on August 25, 1989, under separate agreements that were referred to as bonus and noncompetition agreements, a total of $1.25 million was paid to Panzica, Battistella, and Navarra.  As stated, in years prior to the LBO, these individuals generally had been underpaid by petitioner for their services to petitioner, and an understanding existed between Cruze and these individuals that, if Cruze ever sold his stock in petitioner, an effort would be made to pay these individuals additional compensation for their prior services rendered to petitioner.  Accordingly, in the negotiations with JC Investors, Cruze emphasized that he wanted a total of $1.25 million to be paid to Panzica, Battistella, and Navarra in recognition for their services in prior years.  In the negotiations, however, JC Investors was hesitant to pay the employees $1.25 million.  Cruze then offered to have $1.25 million reduced from the $18 million that tentatively had been agreed to be paid to him by JC Investors if this $1.25 million would be paid to Panzica, Battistella, and Navarra for their services in prior years.  Petitioner and JC Investors agreed to this reduction and, as indicated, under the final agreement that

was entered into, Cruze was paid $16.75 million, instead of $18 million, for his stock in petitioner.

The $1.25 million was paid to Panzica, Battistella, and Navarra in the following respective amounts:

| Employee | | Amount |
|---|---|---|
| Panzica | | $1,000,000 |
| Battistella | | 200,000 |
| Navarra | | 50,000 |
| | Total | $1,250,000 |

Of the $200,000 paid to Battistella, $51,000 ($20,000 in principal and $31,000 in interest) in substance and in fact related to and constituted repayments of principal and interest on a $20,000 loan that in earlier years petitioner had received from Battistella.

Panzica, Battistella, and Navarra were regarded by Cruze as key employees of petitioner and, at Cruze's suggestion, they were requested to enter into, and they did agree to, covenants not to compete with petitioner for a period of 3 years which period was not to begin until they left their employment with petitioner. No dollar amount was allocated to the covenants not to compete that were entered into by Panzica, Battistella, and Navarra.

CC Acquisition incurred expenditures in connection with the LBO totaling $1,342,347, for which petitioner became liable as the successor corporation. Of these total $1,342,347 in

expenditures, $692,347 constituted finance charges relating to the financing provided by FNBB and Mezzanine Capital. The remaining $650,000 constituted legal and professional fees.

On October 16, 1989, for $1,000, FNBB assigned the options that it held in the stock of CC Holdings to Bank of Boston Capital (Bank of Boston), a wholly owned subsidiary of FNBB. Subsequently, on September 12, 1990, Bank of Boston assigned to Security Pacific National Bank (SPNB) for an unspecified consideration a portion of the options representing 5 percent of the equity in CC Holdings, and Bank of Boston retained the options with respect to the remaining 7.5 percent of the equity in CC Holdings.

On November 5, 1991, CC Holdings was merged into petitioner, and petitioner's stock was offered to the public in an initial public offering (IPO) at $10 per share. Most of petitioner's debts were paid off using the $25 million in proceeds realized from the IPO.

On November 5, 1991, simultaneously with the IPO, the options held by Bank of Boston and SPNB in CC Holdings' stock were exercised, and the banks received a total of 313,125 shares of stock in petitioner with a combined total value of $3,131,250. The combined net value of the stock in petitioner that the banks realized in exercising the options equaled $3,068,750 ($3,131,250 less the $62,500 exercise price for the options).

On July 22, 1993, a secondary public offering was held with stock in petitioner selling for $17.50 per share. Through this secondary offering, JC Investors sold off all of its stock in petitioner.

During the years in issue, petitioner operated as an accrual basis taxpayer with a tax year ending January 31.

Tax Returns and Audit

On its corporate Federal income tax returns for each of its taxable years 1990 through 1993, petitioner claimed a current business expense deduction to amortize a ratable portion of the $5 million paid to Cruze in 1990 under the 3-year covenant not to compete, as follows:

| Tax Year Ending | Amortization Claimed |
|---|---|
| Jan. 31, 1990 | $ 694,444 |
| Jan. 31, 1991 | 1,666,667 |
| Jan. 31, 1992 | 1,666,666 |
| Jan. 31, 1993 | 972,223 |
| Total | $5,000,000 |

On its 1990 corporate Federal income tax return, petitioner claimed an ordinary business expense deduction for the total $1.25 million paid to Panzica, Battistella, and Navarra under the bonus and noncompetition agreements.

On its 1992 corporate Federal income tax return, petitioner claimed a current business deduction of $1,342,347 for financing charges allegedly incurred in connection with the LBO.

On petitioner's tax returns, no original issue discount (OID) was claimed as a deduction relating to the options issued to FNBB.

For its financial accounting purposes, FNBB reported the options it received in the stock of CC Holdings as an asset on its books and records at a nominal value of $1,000, and for Federal income tax purposes no OID was reported as income by FNBB relating to the options.

On audit of petitioner's taxable years 1992, 1993, and 1994, and of petitioner's claimed net operating loss carryforwards from petitioner's taxable years 1990 and 1991, respondent disallowed for 1990 through 1993 the claimed business expense deductions relating to Cruze's $5 million covenant not to compete. Respondent also disallowed for 1990 the claimed business expense deduction relating to the $1.25 million paid to Panzica, Battistella, and Navarra in 1989 under the bonus and noncompetition agreements.

The basis for respondent's disallowance for each year of the claimed business expenses relating to Cruze's $5 million covenant not to compete was the determination that the payments to Cruze constitute nondeductible capital expenditures.

The basis for respondent's disallowance for 1990 of the $1.25 million paid to Panzica, Battistella, and Navarra apparently was the determination that the $1.25 million relates

primarily to the noncompetition agreements each of these individuals entered into, not to payments for services rendered in prior years.  Because Panzica's, Battistella's, and Navarra's 3-year noncompetition obligations were not triggered until they left employment with petitioner and because, in 1990, Panzica, Battistella, and Navarra still worked for petitioner, respondent determined that no portion of the $1.25 million should be deducted in 1990 or in later years before the Court.

For 1992, respondent disallowed the $1,342,347 that petitioner claimed as deductible financing charges on the grounds that the expenses constitute nondeductible capital expenditures relating to acquisition of the stock in petitioner.  Respondent now agrees that $692,347 of the $1,342,347 was properly deducted by petitioner as ordinary business expenses.  Only $650,000 remains in dispute as alleged nondeductible capital expenditures.

Although not claimed on its 1990 through 1994 corporate Federal income tax returns as filed, petitioner in its petition affirmatively asserts beginning for 1990 (in order to increase or to maintain the amount of the NOL claimed from 1990) and later years, or beginning for 1992 and later years, that it is entitled to amortize a portion of the claimed $3,068,750 as original issue discount relating to the options that were issued to FNBB.  Alternatively, petitioner argues that the $3,068,750 should be

deductible as loan fees or compensation paid to FNBB under section 83.[2]

OPINION

$5 Million Paid to Cruze as Covenant Not to Compete

For the years in issue, amounts paid for covenants not to compete generally are deductible over the useful life of the covenants as current business expenses; whereas amounts paid for goodwill or going concern value of a business generally are treated as nondeductible capital expenditures. Warsaw Photographic Associates, Inc. v. Commissioner, 84 T.C. 21, 48 (1985).

To be respected for Federal income tax purposes, covenants not to compete should reflect economic reality. Patterson v. Commissioner, 810 F.2d 562, 571 (6th Cir. 1987), affg. T.C. Memo. 1985-53; Lemery v. Commissioner, 52 T.C. 367, 375 (1969), affd. per curiam 451 F.2d 173 (9th Cir. 1971). Where parties to purported covenants not to compete do not have adverse tax interests, the covenants will be strictly scrutinized. Schulz v. Commissioner, 294 F.2d 52, 55 (9th Cir. 1961), affg. 34 T.C. 235

---

[2]     Also after trial, on June 2, 1997, petitioner filed under Rule 41 a motion for leave to amend the petition for 1993 and 1994 in order to claim that capitalized costs of $586,236 and 832,706, respectively, should be allowed as deductible current business expenses relating to petitioner's mailing and shipping operations. We deny petitioner's motion for leave to amend the petition and to raise this new issue at this late date. Rule 41(a); Law v. Commissioner, 84 T.C. 985, 990 (1985); O'Rourke v. Commissioner, T.C. Memo. 1990-161.

(1960); <u>Buffalo Tool & Die Manufacturing Co. v. Commissioner</u>, 74 T.C. 441, 447-448 (1980). Further, taxpayers generally bear the burden of proving entitlement to claimed deductions. Rule 142(a).

Respondent argues primarily that the covenant not to compete by Cruze lacks economic reality and that the $5 million paid to Cruze constitutes a nondeductible capital expenditure for the goodwill or going concern value of petitioner. Respondent emphasizes that JC Investors, petitioner, and Cruze did not have adverse tax interests and that the terms of the covenant were not separately negotiated. Respondent notes Cruze's testimony that he would have been "pretty silly" to sell his company and then spend his money trying to compete with it.

If we conclude that the covenant not to compete should be respected for Federal income tax purposes, respondent argues that the proper amount to be allocated to the covenant is $2.3 million, not the $5 million claimed by petitioner.

Petitioner argues that the covenant not to compete reflects economic reality and that the entire $5 million paid to Cruze with regard thereto should be respected. Petitioner emphasizes Cruze's management talents, knowledge of the industry, business contacts, financial resources, and general ability to compete with petitioner.

As set forth in our findings of fact, the evidence establishes the appropriateness and need for the 3-year covenant not to compete between petitioner and Cruze. In light of Cruze's extensive experience and contacts in the motorcycle parts industry, petitioner's business would have been significantly and adversely affected if Cruze had attempted to compete with petitioner. Further, JC Investors would not have consummated the purchase of the stock in petitioner if Cruze had not agreed to the covenant not to compete.

We conclude that the covenant not to compete between petitioner and Cruze had economic reality and that the agreement is to be respected for Federal income tax purposes.

Petitioner's expert valued Cruze's covenant not to compete at $5 million. Respondent's expert valued the covenant at $2.3 million using a discounted cash flow analysis of his estimate of losses petitioner might suffer if Cruze established a business in competition with petitioner.

Based on our review of the expert witness reports and based on our findings of fact that establish Cruze's importance to the business of petitioner and his experience and connections in the motorcycle parts industry, we conclude that no discount should be applied to the covenant not to compete and that the full $5 million represents payment to Cruze for his covenant not to compete against petitioner.

$1.199 Million Paid to Panzica, Battistella, and Navarra

Amounts paid by taxpayers to employees as compensation for services rendered in the current or prior years are generally deductible as ordinary and necessary business expenses.  Sec. 162(a); Lucas v. Ox Fibre Brush Co., 281 U.S. 115, 119 (1930). Amounts paid for covenants not to compete are amortized as deductions over the life of the covenants.  Warsaw Photographic Associates, Inc. v. Commissioner, supra at 48.

Petitioner argues that $1.199 million of the total $1.25 million paid to Panzica, Battistella, and Navarra ($1.25 million less the $51,000 associated with the principal and interest payments on the loan petitioner received from Battistella) should be treated for Federal income tax purposes as compensation paid to the three employees in 1990 for services rendered to petitioner in prior years.  Petitioner argues that no portion of the $1.199 million should be allocated to separate covenants not to compete between petitioner and the employees.

Respondent argues that the entire $1.199 million, or some portion thereof, should be allocated to covenants not to compete between petitioner and the employees and allowed as deductions and amortized only after the covenants begin to run once the employees stop working for petitioner (i.e., in years not before the Court).

We agree with petitioner.

The evidence, although not extensive, is credible and persuasive and establishes that the $1.199 million was paid to Panzica, Battistella, and Navarra as consideration for services rendered in prior years and not for covenants not to compete. The $1.199 million was paid in 1990, not deferred until later years after the employees terminated their employment with petitioner and was based on a longstanding understanding between Cruze, on the one hand, and Panzica, Battistella, and Navarra, on the other, that Panzica, Battistella, and Navarra would be compensated with additional compensation for services rendered if Cruze's stock in petitioner was sold.

The bonus and noncompetition agreements did not specifically allocate any of the $1.199 million to the covenants not to compete. See Annabelle Candy Co. v. Commissioner, 314 F.2d 1, 7 (9th Cir. 1962), affg. per curiam T.C. Memo. 1961-170; Major v. Commissioner, 76 T.C. 239, 250 (1981); Rich Hill Ins. Agency, Inc. v. Commissioner, 58 T.C. 610, 617 (1972).

It also appears that because Panzica, Battistella, and Navarra did not sell any stock in petitioner in connection with entering into the bonus and noncompetition agreements, under California law, the noncompetition clauses were unenforceable. See Cal. Bus. & Prof. Code secs. 16600, 16601 (West 1997); Metro Traffic Control Inc. v. Shadow Traffic Network, 27 Cal. Rptr. 2d 573 (Ct. App. 1994).

For the above reasons, we conclude that the $1.199 million paid to Panzica, Battistella, and Navarra should be treated as compensation paid to the employees for services rendered in prior years and as deductible by petitioner for 1990 as ordinary and necessary business expenses.

$650,000 in Legal and Professional Fees

Under section 162(k), amounts paid by a corporation in connection with redemption of its stock are treated as nondeductible capital expenditures. Sec. 162(k); see United States v. Hilton Hotels Corp., 397 U.S. 580 (1970); Woodward v. Commissioner, 397 U.S. 572, 577-578 (1970). Amounts that are to be capitalized under section 162(k) include amounts paid in consideration for the stock, fees incurred in connection with the redemption of the stock, and legal, accounting, appraisal, and brokerage fees, and any other expenses (except loan fees) necessary or incidental to the redemption. See H. Rept. 99-426, at 248-249 (1985), 1986-3 C.B. (Vol. 2) 248-249; S. Rept. 99-313, at 222-224 (1986), 1986-3 C.B. (Vol. 3) 222-224; Fort Howard Corp. & Subs. v. Commissioner, 107 T.C. 187, 188-189 (1996), supplementing 103 T.C. 395 (1994).

Also, under various applications of the step transaction doctrine, a series of formally separate steps may be collapsed and treated as a single transaction. Penrod v. Commissioner, 88 T.C. 1415, 1428 (1987). A series of steps may be collapsed and

treated as one if at the time the first step was entered into, there was a binding commitment to undertake the later step (binding-commitment test), if the separate steps constitute prearranged parts to a single transaction intended to reach the end result (end-result test), or if the steps are so interdependent that the legal relations created by one step would have been fruitless without a completion of the series (mutual-interdependence test).  Id. at 1429-1430.

Respondent argues that the acquisition by CC Holdings of Cruze's stock in petitioner should be treated for Federal income tax purposes as a redemption and that the $650,000 constituted expenses incurred in connection with that redemption. Alternatively, if the transaction is not treated as a stock redemption, respondent argues that the expenses should be capitalized due to significant long-term benefits to petitioner and that no current deduction should be allowed in any year before us.

Petitioner argues that for Federal income tax purposes the purchase of Cruze's stock by JC Investors did not constitute a stock redemption and that the expenses should be deductible either for 1992 or for 1993, the year in which JC Investors disposed of its interest in petitioner.

We agree with respondent's primary argument.

The evidence indicates that CC Acquisition was formed as a subsidiary of CC Holdings solely to facilitate CC Holdings' acquisition of the stock in petitioner. CC Acquisition was incorporated only 10 days prior to the LBO, and CC Acquisition did not conduct any activities unrelated to the LBO during the short period of its existence.

The several integrated steps of the LBO involving CC Acquisition -- its formation, its receipt of financing, its merger into petitioner, and petitioner's assumption of its liabilities -- constituted prearranged integrated steps to facilitate the acquisition of the stock of petitioner, and these steps were mutually interdependent.

We note that other than the formation of CC Acquisition, which occurred 10 days prior to the LBO, the remaining steps to the transaction essentially occurred simultaneously on August 25, 1989.

Because CC Acquisition was formed merely as a transitory corporation to facilitate the LBO, we conclude that CC Acquisition and the steps of the transaction involving CC Acquisition should be disregarded for Federal income tax purposes. In effect, the transaction is to be treated for Federal income tax purposes as if petitioner received loans directly from FNBB and then used $16.75 million of the loan proceeds to redeem the shares of stock that were held by Cruze.

See Bittker & Eustice, Federal Income Taxation of Corporations and Shareholders, par. 5.04[6], at 5-29 (6th ed. 1997); 1 Ginsburg & Levin, Mergers, Acquisitions, and Buyouts, sec. 202, at 2-15 (1998); 2 Ginsburg & Levin, Mergers, Acquisitions, and Buyouts, sec. 1302.1.3, at 13-19 (1998).

For 1992, the $650,000 in legal and professional fees that petitioner incurred in connection with the redemption of Cruze's stock constitute under section 162(k) nondeductible capital expenditures.

OID Associated With $26 Million Loan

Original issue discount (OID) associated with a loan is treated as interest and, ratably over the term of the loan, is deductible by the debtor and taxable as ordinary income to the creditor. Secs. 163(e), 1272(a)(1). Generally, OID is incurred when the debtor, at the time the loan is obtained, receives from the creditor less than the face amount of the loan.

Where, in addition to the obligation to pay the creditor the principal amount of the loan obligation and interest, a debtor corporation grants to a creditor options to acquire stock in the debtor corporation, in determining whether OID is associated with the loan, the principal amount of the loan obligation and the value of the options are considered together and are treated as a single investment unit. Sec. 1273(c)(2). Typically, in this situation, the amount of OID, if any, associated with the loan

will correspond to the amount or portion of the value of the investment unit that is allocated to the options. Secs. 1273(b)(2), 1273(c)(2), 1275(a)(2)(B).

At trial and on brief, the parties herein agree that OID is to be associated with the $26 million loan that was received from FNBB to the extent that the options (to acquire stock in CC Holdings) that were granted to FNBB had any ascertainable value as of the date petitioner received the loan and the options were issued to FNBB.[3] The parties, however, disagree as to the value of the options, and thus they disagree as to the existence and amount of any OID associated with the loan.

Petitioner values the options at or exceeding $2.6 million and argues that it should be entitled to deduct at least $2.6 million as OID over the separate terms of the 3 loans that made up the total $26 million loan.

Respondent argues that no OID was associated with the $26 million loan, and, alternatively, if OID was incurred, the amount thereof was no more than $31,850.

The evidence establishes, and the parties agree, that the options to acquire stock in CC Holdings that were granted to FNBB were issued "at the money" with a $500 per share exercise price.

---

[3] As indicated, after the LBO, petitioner became liable for the debts of CC Acquisition. For convenience, in discussing the OID issue, we substitute petitioner for CC Acquisition as the debtor on the loan.

This $500 per share exercise price was equal to the price paid, at that time, by other investors for the stock of CC Holdings. This constitutes strong evidence that the options had no premium value to be associated with them at the time of issuance. Thus, any value that might attach to the options would be speculative and would depend on the profits of petitioner and on appreciation in the value of the underlying stock in subsequent years.

On its original tax returns for its 1990 taxable year, the taxable year in which the options were issued, and for its 1991 through 1994 taxable years, petitioner did not treat the $26 million loan as having any OID associated with it. Similarly, neither FNBB nor Bank of Boston treated the $26 million loan as having any OID associated with it, and only a nominal $1,000 value was associated with the options by FNBB. This also constitutes significant evidence that the options had no premium value to be associated with them at the time of issuance.

Certainly, representatives of FNBB and Bank of Boston hoped that the options, in subsequent years, would increase in value and increase greatly the income their banks would receive in connection with financing the LBO. That speculative future value, however, does not establish that OID is associated with the $26 million loan.

Petitioner relies on Monarch Cement Co. v. United States, 634 F.2d 484 (10th Cir. 1980), and the approach adopted therein

to argue that the $26 million loan was obtained by petitioner at an interest rate discount and that the interest rate discount gives rise to OID associated with the loan. We decline to apply the approach used in Monarch Cement Co. The evidence in the instant case does not establish that the $26 million loan was obtained at a below-market interest rate. Although bank representatives testified that they would have liked to have charged a higher interest rate on the $26 million loan, the credible evidence does not establish that the parties to the $26 million loan actually negotiated and agreed to a discounted interest rate as part of the compensation therefor.

Because the options were issued at market, petitioner and CC Holdings incurred no direct costs in issuance of the options. Similarly, any income to be realized by the banks on exercise of the options in subsequent years we regard as in the nature, not of OID, but of capital appreciation in an equity investment.

Petitioner makes numerous arguments as to why it should be allowed OID deductions beginning either in the year the options were issued or in the year the options were exercised. As we have explained, the evidence does not establish that any OID was incurred in the year of issuance.

With regard to 1992, the taxable year in which the options were exercised, petitioner argues that it should be allowed a deduction of $3.069 million as either OID, as loan fees, or as

compensation paid under section 83. We disagree. The existence of OID is determined as of the date of issue of the investment unit. Secs. 1273(b)(2), 1273(c)(2), 1275(a)(2)(B).

In support of the argument that it should be entitled to a $3.069 million deduction for 1992 as loan fees with regard to the $26 million loan, petitioner relies on cases where options were issued as trade discounts in connection with long-term sales contracts. See Computervision Intl. v. Commissioner, T.C. Memo. 1996-131; Convergent Techs., Inc. v. Commissioner, T.C. Memo. 1995-320; Sun Microsystems, Inc. v. Commissioner, T.C. Memo. 1993-467. Petitioner's reliance on these cases is misplaced. The options in the instant case were not issued as trade discounts but as part of a lending transaction. Further, the cases cited do not involve loan fees or loan charges. No credible evidence supports petitioner's claimed deduction for loan fees.

Further, under section 83 only upon exercise of stock options received for services rendered may a corporation claim deductions for compensation paid. The options at issue herein were not issued to FNBB in connection with services rendered.

The evidence does not support, for any of the years in issue, petitioner's claim to a deduction of $3.069 million for OID, loan fees, or compensation paid under section 83 relating to

the $26 million loan.  We reject petitioner's arguments on this issue.

For each of the years in issue and for each adjustment reflected in respondent's notice of deficiency, respondent determined an accuracy-related penalty under section 6662(a) against petitioner for substantial understatements of tax.

With regard to the disallowance for 1992 of the claimed $650,000 in acquisition-related expenditures that we sustain herein, petitioner has not demonstrated that it had substantial authority to support this claimed deduction, and we sustain imposition of this penalty.

To reflect the foregoing,

<u>Decision will be entered</u>

<u>under Rule 155</u>.