**CUSTOM CHROME, INC., and Subsidiaries, Petitioner–Appellant,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent–Appellee.**

No. 98–71378

United States Court of Appeals, Ninth Circuit.

Argued and Submitted April 14, 2000

Filed July 10, 2000

---

Harry J. Kaplan, San Jose, California, for the petitioner-appellant.

Richard Farber, Tax Division, U.S. Department of Justice, Washington, DC, for the respondent-appellee.

Before: TASHIMA and GRABER, Circuit Judges, and STOTLER, District Judge.*.

TASHIMA, Circuit Judge:

Custom Chrome, Inc., an independent supplier of Harley–Davidson motorcycle parts and accessories, and its subsidiaries, appeal from the decision of the Tax Court determining deficiencies in Custom Chrome's income taxes for the tax years 1992–1994. Specifically, Custom Chrome appeals the Tax Court's determination that warrants issued by Custom Chrome to its lender in connection with a loan transaction were valueless, so that Custom Chrome was not entitled to any deductions relating to the warrants. Custom Chrome also appeals the Tax Court's holding that it was not entitled to deduct fees relating to the acquisition of its sole shareholder's stock. The Tax Court had jurisdiction pursuant to 26 U.S.C. §§ 6213 and 7442. We have jurisdiction pursuant to 26 U.S.C. § 7482, and we affirm in part, reverse in part, and remand for further proceedings.

## I. Factual and Procedural Background [1]

In the late 1980s, the Jordan Company ("Jordan") entered into an agreement with Tyrone Cruze ("Cruze"), the sole shareholder of Custom Chrome,[2] to purchase all of Cruze's stock for $16.75 million, along with an extra $5 million for a covenant not to compete and an additional $2.6 million to enable him to pay federal taxes for prior years. Jordan's purchase of stock was structured as a leveraged buyout whereby a holding company and an acquisition company were utilized to purchase Cruze's shares. Subsequent to the purchase, the acquisition company was merged into Custom Chrome, which became a wholly-owned subsidiary of the holding company.

Three groups funded the buyout. The acquisition company borrowed $26 million from the First National Bank of Boston ("FNBB"). The holding company borrowed $7 million from Mezzanine Capital and Income Trust ("Mezzanine"). Finally, the holding company raised $500,000

---

* The Honorable Alicemarie H. Stotler, United States District Judge for the Central District of California, sitting by designation.

1. Except as noted, all statutory references are to the Internal Revenue Code of 1986 (26 U.S.C.), as amended, and in effect during the years in issue ("I.R.C."), and all regulatory references are to the regulations (26 C.F.R.)

in effect during the years in issue ("Treas. Reg.").

2. Cruze's wife also owned some of the shares. Because it does not affect the outcome of this case, for convenience, we refer to Cruze as the sole owner.

through the sale of its stock to insiders at $500 per share.

In connection with its $26 million loan, FNBB received warrants (in essence, options) to purchase effectively up to 12.5 percent of the stock of Custom Chrome at $500 per share—the same price paid by the insiders. The warrants also contained a put option that allowed FNBB to sell a portion of the warrants back to Custom Chrome at specified times according to a formula price. According to FNBB's officers, the warrants were intended to compensate FNBB for the high risk associated with providing the loan. FNBB loan officers thought that the warrants might be worth as much as $5 million in five years, and the terms of the warrants were hotly negotiated among the interested parties.

FNBB listed on its books, however, that the warrants were purchased in their entirety for $1,000. Shortly after acquiring the warrants, FNBB assigned them to Bank of Boston Capital ("BancBoston") (FNBB and BancBoston are collectively referred to as the "Bank"), which also listed on its books the value of the warrants as $1,000. BancBoston subsequently assigned a portion of the warrants to Security Pacific National Bank ("Security Pacific") for an unspecified amount.

In connection with the buyout of Cruze, the acquisition company incurred expenses of $1,342,347. Of that amount, $692,347 represented finance charges for the loan provided by FNBB and Mezzanine, and the remaining $650,000 was for legal and professional fees relating to the acquisition of Cruze's stock.

In late 1991, Custom Chrome's stock was offered to the public in an initial public offering ("IPO") at $10 per share. At that time, BancBoston and Security Pacific exercised their warrants, receiving a total of 313,125 shares of stock with a combined value (net of the exercise price) of $3.07 million. In July 1993, Jordan sold off all its stock in Custom Chrome in a secondary public offering.

On its federal income tax returns, Custom Chrome did not take any deductions relating to the issuance of the warrants. FNBB reported the warrants on its books with a value of $1,000, but it did not report any income relating to the issuance of the warrants.

After the Commissioner disallowed various claimed deductions (including those relating to the fees incurred in the purchase of Cruze's stock) for the tax years at issue and assessed penalties thereon, Custom Chrome petitioned the Tax Court for a redetermination of its income tax liabilities, claiming *inter alia* that the grant of the warrants entitled it to deductions of approximately $3.07 million.

The Tax Court found the warrants should be valued at the time of issuance. *See Custom Chrome, Inc. v. Commissioner,* 76 T.C.M. (CCH) 386, 393, 1998 WL 556319 (1998) ("*Custom Chrome I* "). Specifically, it held that, because the warrants were part of a loan package—as opposed to a trade discount or in exchange for services rendered—original issue discount rules, which mandated the time of valuation as of issuance, applied. *See id.* The Tax Court then found that the warrants had no value at the time of issuance because: (1) they were "at the money" (*i.e.,* at the same price as the stock itself); (2) any future value was highly speculative; (3) FNBB had reported their value as $1,000; and (4) Custom Chrome failed to take any deductions with respect to the warrants on its original returns. *See id.* at 393–94. Furthermore, the Tax Court found no evidence to support the claim that the loan would have been offered only at a higher interest rate if the warrants had not been issued. *See id.* at 393.

The Tax Court also held that the $650,000 of expenses incurred in the purchase of Cruze's stock was barred by I.R.C. § 162(k) because, under the step transaction doctrine, the purchase was a redemption of stock by Custom Chrome. *See id.* at 392–93. Relatedly, the Tax Court determined that the accuracy-relat-

ed penalty assessed by the Commissioner under I.R.C. § 6662(a) was warranted, because Custom Chrome had not shown any substantial authority supporting its deduction of the $650,000 in fees. *See id.* at 394. Custom Chrome timely appealed to this court.

## II. Standards of Review

■ We review decisions of the Tax Court under the same standards as we review civil bench trials in the district court. *See Estate of Rapp v. Commissioner,* 140 F.3d 1211, 1214 (9th Cir.1998). Although a presumption exists that the Tax Court correctly applied the law, no special deference is given to the Tax Court's decisions. *See AMERCO, Inc. v. Commissioner,* 979 F.2d 162, 164 (9th Cir.1992). Therefore, we review Tax Court conclusions of law de novo, *see Harbor Bancorp & Subsidiaries v. Commissioner,* 115 F.3d 722, 727 (9th Cir.1997), and questions of fact for clear error, *see Boyd Gaming Corp. v. Commissioner,* 177 F.3d 1096, 1098 (9th Cir.1999).

■ The Tax Court's choice of method under the applicable statutes and regulations to value the warrants is an issue of law subject to de novo review. *See Monarch Cement Co. v. United States,* 634 F.2d 484, 486 (10th Cir.1980). Assuming that the Tax Court utilized the correct method to value the warrants, its determination of that value is a finding of fact subject to the clearly erroneous standard of review. *See id.* at 485. The Tax Court's determination that the several steps of a complex transaction are, under the step transaction doctrine, a single taxable transaction is a finding of fact subject

to the clearly erroneous standard of review. *See Robino, Inc. Pension Trust v. Commissioner,* 894 F.2d 342, 344 (9th Cir. 1990). The Tax Court's factual findings regarding the penalty for substantial understatement of income tax are reviewed under the clearly erroneous standard of review. *See Little v. Commissioner,* 106 F.3d 1445, 1449 (9th Cir.1997).

## III. Discussion

### A. *The Appropriate Time for Valuing the Warrants*

When a loan is provided at a face value higher than the amount actually loaned, the debtor is allowed to deduct the difference over the life of the loan as original issue discount ("OID"), while the creditor realizes the OID as ordinary income. *See* I.R.C. §§ 163(e)(1) & 1272(a)(1).[3] Under I.R.C. § 1273(c)(2), whenever "any debt instrument and an option ... [are] issued together as an investment unit ... the issue price for such unit shall be determined ... as if it were a debt instrument."[4] Under I.R.C. § 1273(b)(2), for non-publicly traded debt instruments, "the issue price of each such instrument is the price paid by the first buyer of such debt instrument."

■ Here, the warrants (effectively equivalent to options[5]) were granted at the same time the loan was provided to Custom Chrome. The most straightforward reading of § 1273 is that the value of the warrants should be considered as OID and should be valued at the time the warrants were granted. First, the warrants were clearly intended to compensate the Bank for its additional risk, thereby rais-

**3.** I.R.C. § 163(e)(1) states in relevant part:

In the case of any debt instrument issued after July 1, 1982, the portion of the original issue discount with respect to such debt instrument which is allowable as a deduction to the issuer for any taxable year shall be equal to the aggregate daily portions of the original issue discount for days during such taxable year.

I.R.C. § 1272(a)(1) states:

For purposes of this title, there shall be included in the gross income of the holder

of any debt instrument having original issue discount issued after July 1, 1982, an amount equal to the sum of the daily portions of the original issue discount for each day during the taxable year on which such holder held such debt instrument.

**4.** I.R.C. § 1275(a)(1) defines a debt instrument as a "bond, debenture, note, or certificate or other evidence of indebtedness."

**5.** *See* Rev. Rul. 77–250, 1977–2 C.B. 309.

ing the effective interest rate of the loan and resulting in OID. Second, in order to deduct the OID ratably over the life of the loan, it is necessary to value the warrants at the time of grant. This is borne out by reading together §§ 1273(b)(2) and (c)(2), which require that the warrants be valued as part of the "price paid by the *first buyer* of such debt instrument." I.R.C. § 1273(c)(2) (emphasis added). The most sensible approach is that the first buyer's price must be determined at the time of that buyer's *purchase* of the debt instrument, which includes the warrants. For example, in *Monarch Cement*, the Tenth Circuit treated the "equity kicker" portion of a loan—which was comprised of warrants—as OID subject to valuation at the time of issuance. *See* 634 F.2d at 485–86.

Custom Chrome's argument that the warrants should be valued at the time of exercise—when the value of the warrants is certain—may be sensible from a policy perspective, but contradicts the terms of the statute. First, the cases that Custom Chrome cites are inapposite because all of them involve trade discounts implemented through warrants in long-term sales contracts. In *Computervision International Corp. v. Commissioner*, 71 T.C.M. (CCH) 2450, 2454–55, 1996 WL 116379 (1996), *vacated on other grounds*, 164 F.3d 73 (1st Cir.1999), for instance, although a loan made via a debenture was part of the overall transaction, the warrants at issue were granted in exchange for high-volume sales, and not as OID.[6] *See also Conver-*

*gent Technologies, Inc. v. Commissioner*, 70 T.C.M. (CCH) 87, 89, 1995 WL 422677 (1995) (noting that warrants were only exercisable once sales volume hit a specified amount); *Sun Microsystems, Inc. v. Commissioner*, 66 T.C.M. (CCH) 997, 1993 WL 390471 (1993) (same underlying factual situation as *Computervision*). Here, the warrants were an integral part of the loan package and, hence, OID that must be valued at the date of grant.

Second, Custom Chrome's reliance on I.R.C. § 83 is misplaced, because that section deals only with stock options received for services rendered. In particular, Treas. Reg. § 1.83–7 mandates that, when the fair market value of options granted in exchange for warrants is not readily ascertainable at the time of grant, the value of the options must be valued at the date of exercise. *See Pagel, Inc. v. Commissioner*, 905 F.2d 1190 (8th Cir. 1990) (holding that valuation of options granted for services rendered should be at time of exercise when value was not readily ascertainable at time of grant). Here, because the warrants were issued as part of an entire loan transaction (as opposed to in return for services), they are considered OID and, under I.R.C. § 1273(b)(2) and (c)(2), must be valued at the time of grant.

Third, Custom Chrome's argument that the put options were equivalent to additional interest and were, therefore, a debt instrument subject to proposed Treas. Regs. § 1.163–7(a) and (f) (1986),[7] is misplaced. Even if we were to apply the

---

**6.** Custom Chrome relies on the following dicta in *Computervision* to support its argument: Petitioners, in an effort to bolster their argument that the second warrant was a capital asset of CV, suggest that the warrant represented "partial compensation to Computervision for the below-market interest rate on the loans" CV made to Sun as part of the workstation purchase transaction. If in fact the net proceeds of the sale of the second warrant constituted additional interest income to CV with respect to its loan to Sun, the proceeds would be taxable as ordinary income and not long-term capital gain. 71 T.C.M. at 2466–67 n. 19. That footnote, however, merely indicates that the *character* of the income would be ordinary, yet states

nothing about the *timing* of when such a realization event would be valued. This is consistent with the OID rules, which provide that OID is treated as a deduction in ordinary income to the debtor and an increase in ordinary income to the creditor. *See* I.R.C. §§ 163(e), 1272(a)(1).

**7.** In tandem, these sections provide that "if a debt instrument is issued and subsequently repurchased at a price in excess of the issue price plus any amount of original issue discount deductible prior to the date of repurchase ... the excess of the repurchase price over the issue price ... is deductible as interest for the taxable year." Proposed Treas. Reg. 1.163 7(f)(1) (1986).

proposed regulations, because the puts were exercisable at the discretion of FNBB, and it was not clear that it would have been in FNBB's interest to exercise the puts (indeed, FNBB did not), the puts were pure options and not a debt instrument. *See* I.R.C. § 1275(a)(1) (defining a debt instrument to mean a "bond, debenture, note, or certificate or other evidence of indebtedness"); Proposed Treas. Reg. 1.1272–1(j) (1986) (noting that puts should be included in the OID valuation but stating nothing about whether puts are debt instruments); *cf. Foster v. Commissioner*, 756 F.2d 1430, 1436–37 (9th Cir.1985) (holding that, where a complex series of transactions clearly results in additional income to lender, that income should be characterized as interest income rather than capital gains). Thus, the puts should be valued as OID under I.R.C. § 1273(c)(2).

In sum, the Tax Court did not err in utilizing the time of issuance to determine the value of the warrants.

### B. *The Value of the Warrants*

In a very similar factual situation, the Tenth Circuit in *Monarch Cement* valued the options at issue for OID purposes by considering the difference between the interest rate that would have been required without the options and the interest rate actually used. *See* 634 F.2d at 484–86. In this case, the Tax Court "decline[d] to apply the approach" of *Monarch Cement*, because it found that the "evidence in the instant case does not establish that the $26 million loan was obtained at a below market interest rate." *Custom Chrome I*, 76 T.C.M. at 393. A necessary corollary of this finding is that the warrants were worthless at the time they were granted. *See id.* at 393–94.

It is an open question in this circuit what method should be used for valuing warrants for purposes of OID. The problem in valuing the warrants stems from the combination of the general speculative nature of options and the related difficulty of determining precisely what effect options granted for OID have on a core loan transaction. The Tenth Circuit in *Monarch Cement* applied one reasonable approach to this problem by looking at the difference between the interest rate actually used and the standard market rates that otherwise would have been applied in the absence of the equity kicker of granting options. *See* 634 F.2d at 484–85.[8] We hold that the approach of *Monarch Cement* may be suitable to value options granted for OID, but should not be the only method open to the courts.[9] In par-

---

**8.** In this regard, the phrase "rates that otherwise would have been applied" is a bit of a misnomer, because borrowers that require a higher interest rate usually do not have sufficient cash flow to meet the high-interest payments demanded by a higher interest rate. For example, Ken Jones, Vice–President, Commercial Lending Officer, 1989, Bank of America, testified that "in these types of transactions, if you were to charge a higher rate of interest or charge a higher fee, given the amount of debt that this company was having to take on, it would probably not be able to service the debt and you'd immediately create a problem for yourself."

Indeed, according to the testimony of Gregory C. Foy, Vice President, Acquisition Finance, 1989, BancBoston, probably because of Custom Chrome's tight cash flow, the Bank utilized options, as opposed to a higher interest rate, to increase its internal rate of return. Thus, *Custom Chrome's* lack of sufficient cash flow explains why no higher interest was ac-

tually negotiated. So when ascertaining what the interest rate would have been in the absence of the warrants, the factfinder should simply determine the rate of return (i.e., *effective* interest rate) required by the lender for the entire loan transaction to take place.

**9.** The Commissioner argues that, although the *Monarch Cement* approach was mandated by the Treasury Regulations in effect at the time *Monarch Cement* was decided, those regulations were not in effect at the time of the transaction in this case. The Commissioner also notes that, although proposed Treas. Reg. § 1.1273–2 (1986)—which was similar to the provisions governing *Monarch Cement*— would have applied during the time of the Custom Chrome buyout, the proposed regulation was later withdrawn and replaced with another, less specific regulation, *see* Treas. Reg. § 1.1272–2 (1994).

Because the new regulation applies only to debt instruments issued on or after April 4,

ticular, the factfinder may adopt any well-established and reliable method for determining the value of the options, such that the factfinder can assess with reasonable accuracy the value of the options with respect to the evidence in the record.[10]

■ Under any well-established and reliable financial method, the options in this case clearly did not have zero value. Contrary to the Tax Court's findings, there is no evidence that reasonably supports the conclusion that the loans were not provided at below-market rates. First, even the Commissioner's own expert stated in a detailed valuation study that, under two different methods,[11] the value of the warrants was positive.[12]

Second, no one contests that the terms of the warrants were hotly negotiated. In particular, Foy testified that the Bank and the shareholders of the new company "viewed [the warrants] as quite valuable and that's why they were the subject of obviously a very heated negotiation over the amount." If the options were valueless at the time they were granted, none of the parties would have wasted so much time, effort, and money negotiating the terms of worthless securities.

Third, the Bank's documents indicated that the future value of the warrants after five years was approximately $5 million. Loan professionals at BancBoston based this valuation on the expected market value of the company if it went public, under the well-established method of taking a standard multiple of a company's expected earnings before interest, depreciation, amortization, and taxes ("EBIDAT"). Foy testified that the $5 million expected future value was what they "were looking forward to in order to achieve [an] internal rate of return of 22 to 23 percent." Indeed, Foy stated that "[t]he bank would not have made a $26 million loan without getting 12 percent warrants and without viewing those warrants as having value."

Under a similar method of valuation, Bank of America—from which Custom Chrome ultimately decided not to borrow—determined that the value of warrants for 12 percent of Custom Chrome, along with put and call provisions similar to those included with the warrants granted to FNBB, had a future value after five years of approximately $4.4 million. For instance, Michael Romanchak, Vice–President of Commercial Banking, 1989, Bank of America, testified that he would not have taken the loan to the relevant committee for evaluation without the warrants being included. Like FNBB, Bank of America was looking for an internal return of approximately 20 to 25 percent, which exceeded the interest rates of the bank's pure commercial loans.

The Tax Court's reasoning and the Commissioner's arguments proffered in favor

---

1994, we are not bound by it in this case. In any event, although the new regulation may not provide specific rules for determining the value of the options, the factfinder must utilize *some* reliable method to determine the value of the options that are included as OID. Because the method of *Monarch Cement* is reliable and well-established, we conclude that that is one of several methods available to the courts for valuing options granted in return for OID.

10. Other well-established and reliable methods include but are not limited to: (1) estimating as a multiple of earnings before interest and taxes ("EBIT") the present value of the portion of the company that may be purchased by exercise of the options; (2) comparing the value of the total debt instrument to the published values of comparable debt instruments of other issuers, taking into account the factors listed in former Treas. Reg. § 1.1232–3(b)(2)(ii)(a) (1986); and (3) the Black–Scholes method, *see Snyder v. Commissioner*, 93 T.C. 529, 540–42, 1989 WL 129656 (1989) (discussing that method).

11. The expert used the Black–Scholes method as well as the method of determining the value of additional interest that otherwise would have been charged in the absence of the warrants.

12. Originally, in his valuation report, the Commissioner's expert claimed that the value of the warrants was $630,000. Apparently, the expert neglected to take into account the $7 million loan provided by Mezzanine. At trial, the expert stated that he had revised his valuation to $45,000.

of a zero valuation are unsupportable. First, the Tax Court places heavy emphasis on the warrants being "at the money," that is, at a strike price equal to the price being offered to investors at the time of the buyout. *Custom Chrome I,* 76 T.C.M. at 393 (internal quotation marks omitted). Specifically, the Tax Court stated:

> This constitutes strong evidence that the options had no premium value to be associated with them at the time of issuance. Thus, any value that might attach to the options would be speculative and would depend on the profits of petitioner and on appreciation in the value of the underlying stock in subsequent years.

*Id.* As a matter of finance, that an option is "at the money" does not render the option valueless. An option has two values: an intrinsic value and a time value. *See, e.g.,* Charles J. Woelfel, Encyclopedia of Banking & Finance 874 (10th ed.1994). The intrinsic value of an option is the difference between the actual value of a share and the exercise price of the option. *See id.* Thus, if ABC stock is trading at $50 a share, and the exercise price of the option is $40 per share, then the intrinsic value of the option is $10. *See id.*

The time value of an option "refers to whatever value the option has in addition to its intrinsic value." *Id.* The time value "reflects the expectation that, prior to expiration, the price of ... [the] stock will increase by an amount that would enable an investor to sell or exercise the option at profit." *Id.* As we noted in *United States v. Smith,* 155 F.3d 1051 (9th Cir.1998):

> An "out-of-the-money" call option allows a person purchasing the option to buy stock during a limited period in the future at a fixed price (the "strike price"). That [future] price is higher than the current market price. Thus, the option holder essentially is betting that the market price will rise over the strike price within the limited time period.

**13.** In the event that the warrants were not highly profitable, the Bank also benefitted from the put provision, which allowed it to

The time period limitations make such investments extremely speculative.

*Id.* at 1069 n. 26 (internal quotation marks and citations omitted).

Here, because the strike price of the warrants was the same as the nominal trading price at the time of the buyout, the warrants had no nominal intrinsic value. On the other hand, based on the voluminous evidence in the record, the warrants had a substantial time value—that is, the Bank and everyone else expected the stock price to increase significantly so that eventually it would be profitable to exercise the warrants.[13] Indeed, the exercising of the warrants eventually netted more than $3 million.

Thus, while the value that "might attach to the options [may have been] speculative," *Custom Chrome I,* 76 T.C.M. at 393, the warrants nevertheless had *some* positive value. The Commissioner has cited no authority for the proposition that the lack of a well-defined present market value and the uncertainty in the future value of a financial instrument imply that the instrument has no value for tax purposes. Unlike Treas. Reg. § 83, which mandates that options without a readily ascertainable value be valued at the time of exercise, the applicable OID regulations require valuation at the time of grant under all circumstances. Indeed, the Commissioner argues as much. Yet, the Commissioner's argument that the warrants had zero value at the time of grant because they had no readily ascertainable market value and, in view of their being nominally at the money, a purely speculative future value, took an impermissible extra step.

For instance, in *Monarch Cement,* the Tenth Circuit upheld the district court's finding that the options were worth almost $650,000, even though the options traded at *more* than the current trading price of the stock. *See* 634 F.2d at 485. The court reasoned:

> sell a specified portion of the warrants back to Custom Chrome.

The general unavailability of the stock [at the time of issuance] could make warrants representing the future right to purchase ten percent of the company worth more than the per share amount at which the very few traded stocks were being sold at the time. Favorable expectations, especially in light of the perceived additional value that would be generated by the substantial loan being contemplated, could have led the lender to believe that warrants to purchase a substantial block of otherwise unavailable stock were worth $13.40 per share.

*Id.* at 485–86. The same reasoning is applicable to this case. While the nominal value of Custom Chrome's stock (*i.e.*, the value paid by insiders) was $500,000, Jordan paid a little over $26 million to acquire Custom Chrome. This is strong, if not irrefutable, evidence that the insiders were receiving a price per share that no outsider could enjoy.[14] Thus, given the unavailability of equity at the $500,000 price, the fact that the warrants were *nominally* at the money has little, if any, bearing on their overall *market* value.

Second, the Tax Court relied heavily on the Bank's listing of the value of the warrants as $1,000 on its books. Similarly, the Commissioner pointed to the Bank's failure to claim the warrants as ordinary income. There is neither evidence in the record nor any legal basis for the proposition that Custom Chrome's and the Bank's financial or tax treatment of the warrants was or should be contractually or otherwise dependent.[15] Thus, the Bank's actions should not bind Custom Chrome.

Third, both the Tax Court and Commissioner emphasized that Custom Chrome failed to take any deductions for OID during the tax years in question. Neither the Tax Court nor the Commissioner, however, cited any authority for the proposition that failure to take proper deductions on submitted tax forms precludes a taxpayer from later utilizing those deductions through a petition for a redetermination of tax liabilities. *See Mamula v. Commissioner*, 346 F.2d 1016 (9th Cir.1965) (holding that, where taxpayer in good faith elects incorrect method of computing tax, the taxpayer is not precluded from recalculating tax liabilities under correct method). Thus, Custom Chrome's mistake in overstating its tax should not be used against it to determine the value of the warrants.

In sum, under any well-established financial method that can determine with reasonable accuracy the value of the warrants in the instant case, a rational factfinder could find only that the warrants were not valueless at the time of issuance. The Tax Court clearly erred in finding otherwise.

## C. The Deductibility of Expenses Incurred in Custom Chrome's Redemption of its Stock

The Tax Court lucidly analyzed whether the $650,000 in expenses incurred by Custom Chrome in the purchase of its stock from Cruze was deductible. In essence, the purchase of Cruze's shares was a redemption (*i.e.*, repurchase) by Custom

---

**14.** The Commissioner argues that, because of the heavy debt undertaken, the value of the equity of Custom Chrome was reasonably $500,000. While Custom Chrome's *book value* may have been close to $500,000, the relevant value for determining OID is the *estimated market value* of Custom Chrome—that is, the value the Bank took into account when discounting the loan. *See Monarch Cement*, 634 F.2d at 485.

**15.** The Bank appears to have been under pressure from federal regulators—in particular, the Office of the Controller of Currency—to state a low value on its books for the value

of the warrants. In particular, Foy testified that, although "it [was] unlikely" that the bank regulators would have permitted the bank to put a value on the warrants, "suffice to say . . . the bank assumed that they were quite valuable and obviously the shareholders of the new company viewed them as quite valuable and that's why they were the subject of obviously very heated negotiation over the amount." Mary Reilly, Vice President, 1989, Banc Boston Capital, also testified that one of the reasons for the low value booked for the warrants was because of the inter-company transfer of the warrants from FNBB to Banc-Boston.

Chrome of its stock. Under I.R.C. § 162(k),[16] expenses incurred in a redemption, other than those involving financing, are treated as nondeductible capital expenses and were thus properly excluded by the Tax Court. *See United States v. Hilton Hotels Corp.*, 397 U.S. 580, 90 S.Ct. 1307, 25 L.Ed.2d 585 (1970); Small Business Job Protection Act of 1996, Pub.L. No. 104–188, § 1704(p), 110 Stat. 1755, 1886 (1996) (amending § 162(k) retroactively so that expenses for indebtedness related to the redemption are deductible over the term of indebtedness); *see generally* Boris I. Bittker & James S. Eustice, Federal Income Taxation of Corporations and Shareholders ¶ e5.04[6] (6th ed.1997).[17]

Specifically, although a holding company and an acquisition company were formed to accomplish the purchase of Cruze's stock, under the "step transaction" doctrine, the separate steps of this transaction must be treated as a single transaction. *Penrod v. Commissioner*, 88 T.C. 1415, 1428–30, 1987 WL 49335 (1987) (holding that, where the separate steps of a transaction constitute pre-arranged parts of a

single transaction designed to reach a particular result, the series of steps is one transaction for tax purposes).

Here, although the acquisition company technically purchased Cruze's stock, it was incorporated only ten days prior to the leveraged buyout, and was immediately merged into Custom Chrome, which assumed all the acquisition company's liabilities. Thus, under the step transaction doctrine, Custom Chrome should be considered to have repurchased—that is, redeemed—its own stock from Cruze. Therefore, under I.R.C. § 162(k), Custom Chrome is not entitled to any deductions for expenses incurred from the redemption.[18]

**D. Accuracy–Related Penalties under I.R.C. § 6662(a)**

■ Under I.R.C. § 6662(a) and (b)(2), a penalty of 20 percent of the portion of underpayment of taxes is imposed for "substantial understatement"[19] of income tax. The penalty applies only if there is no substantial authority for the understatement. *See* Treas. Reg. § 1.6662–4(a).

---

**16.** Section 162(k) states in relevant part:
[N]o deduction otherwise allowable shall be allowed under this chapter for any amount paid or incurred by a corporation in connection with redemption of its stock.
I.R.C. § 162(*l*) (1986). I.R.C. § 162(*l*) was redesignated as I.R.C. § 162(k) in 1988. *See* Technical and Miscellaneous Revenue Act of 1988, Pub.L. No. 100–647, § 3011(b)(3)(A), 102 Stat. 3342, 3625 (1988).

**17.** In *United States v. Kroy (Europe) Ltd. (In re Kroy (Europe) Ltd.)*, 27 F.3d 367 (9th Cir. 1994), before the amendments to § 162(k), this court held that expenses relating to the borrowing of funds to redeem its stock were deductible. Custom Chrome's reliance on this case is misplaced, however, because the expenses at issue do not relate to finance charges.

**18.** Custom Chrome argues further that, at the time Jordan sold all its stock in Custom Chrome, the useful life of whatever intangible asset created by the leveraged buyout of Cruze was finished, such that the costs of creating that asset (*i.e.*, the $650,000 in acquisition fees) should at least have been deductible as of then. As in the argument concerning whether the series of steps in acquiring

Cruze's stock were a single transaction, any expenses incurred by Jordan were ultimately assumed by Custom Chrome. *See Moline Properties v. Commissioner*, 319 U.S. 436, 438–40, 63 S.Ct. 1132, 87 L.Ed. 1499 (1943) (noting that a corporation and its shareholders are distinct taxable entities). Thus, the focus must be on Custom Chrome, not Jordan.

Custom Chrome seems to argue that the exit of Jordan somehow ceased all the benefit created by the original buyout. The control of Custom Chrome by members of Jordan, however, certainly had lasting effects on Custom Chrome's success. Thus, whatever benefit was created by the buyout will not cease until the corporation itself is dissolved or ends. *See McCrory Corp. v. United States*, 651 F.2d 828, 832 (2d Cir.1981) (noting that organizational expenditures are only deductible upon dissolution or liquidation); *Vulcan Materials Co. v. United States*, 446 F.2d 690, 693–94 (5th Cir.1971) (same).

**19.** Generally, for corporations, "substantial understatement" is defined under I.R.C. § 6662(d)(1) as the greater of 10 percent of the tax required or $10,000.

The Commissioner imposed a penalty for the deduction of the $650,000 in acquisition costs of Cruze's stock. As demonstrated above, Custom Chrome has not cited any authority whatsoever—much less substantial authority—for its position. *See Norgaard v.* Commissioner, 939 F.2d 874, 880–81 (9th Cir.1991) ("There is substantial authority for the tax treatment of an item only if the weight of the authorities supporting the treatment is substantial in relation to the weight of authorities supporting contrary positions."). Thus, the Tax Court did not err in upholding the Commissioner's penalty assessment.[20]

### IV. Conclusion

The Tax Court did not err in ruling that the deduction of $650,000 in fees associated with the redemption of Cruze's shares was barred by I.R.C. § 162(k). Additionally, the Tax Court properly held that the warrants were part of the entire loan to Custom Chrome and, therefore, must be valued at the date of issuance. The Tax Court clearly erred, however, in finding that the warrants had no value at the time of issuance. We therefore affirm in part, reverse in part, and remand for a determination of the value of the warrants at the time of issuance. Once the Tax Court has determined the value and the corresponding deductions relating thereto, it should then recalculate the appropriate understatement penalty, if any, under I.R.C. § 6662. Each party shall bear its or his own costs on appeal.

**AFFIRMED in part, REVERSED in part, and REMANDED.**

---

20. We note that any lessening of Custom Chrome's tax burden from the eventual deductions that it will realize from the value of the warrants should be used to reduce the amount of underpayment and, correspondingly, the penalty under § 6662. *See* I.R.C. § 6662(d)(2)(A) (noting that understatement of tax is with respect to *total* tax due for a given tax year).